**UNITED STATES v. FLOREA et al.**

Civil Action No. 1421.

District Court, D. Oregon.
Dec. 17, 1945.

See also 51 F.Supp. 137.

Bernard H. Ramsey, of Portland, Or., Stanley R. Darling, of Eugene, Or., James Leavy, of Pasco, Wash., and Bert C. Boylan, of Portland, Or., for the United States.

William C. McCulloch, of Portland, Or., for defendant Multnomah County Drainage Dist. No. 1.

JAMES ALGER FEE, District Judge.

This is an action for condemnation of certain real property embraced within the limits of the Multnomah County Drainage District. The United States has specified in the complaint that the interest taken is the fee simple title. The answer of the defendant District contains the allegations hereinafter set forth in condensed form.

It is alleged that the defendant, Multnomah County Drainage District, is a municipal or public corporation, organized in order to reclaim swamp and overflowed lands within its territorial limits. Within its boundaries, under the law, there have been constructed certain reclamation works including a dike or levee, an extensive system of interior drainage, and a pumping plant, at an aggregate cost of $600,000 more or less. Through the construction, operation and maintenance of said reclamation works, the lands have been reclaimed and are being protected against overflow by water

from the Columbia River. It financed the construction of these reclamation works through the proceeds of bonds issued. Of the bonds sold, an aggregate amount in par value of $238,000 remains outstanding and unpaid. No part of these bonds is in default.

The benefits accruing to each parcel of land from the reclamation works were duly assessed. The total benefits assessed to 8092.06 acres of land amounted to $692,392. The proceeds of annual assessments were used exclusively for the purposes of (a) operation and maintenance, and (b) bond service. These lands have received, are receiving and will continue to receive in the future, full benefits from the construction, operation and maintenance of these reclamation works. Without this process, the lands would be utterly valueless.

It is further alleged that the defendant District acquired prior to the commencement of this cause, and now owns and holds an indefeasible estate, interest, easement or right in the lands described, to the burden of which the full fee simple title to said lands long has been, is, and in the future will continue to be, subject. This estate, interest, easement or right in said lands is property.

It is clear that if by the condemnation proceedings, the United States has acquired or destroyed a property interest belonging to the Drainage District, or held in trust by it for the aggregate of landowners, there should be compensation therefor. So, there will be an attempt to discover whether the United States is taking a property interest over and beyond the fee simple title, and whether upon the facts outlined, the Drainage District must be compensated therefor.[1]

There are two possible property rights which the United States might ac-

quire or destroy: (1) The power to collect assessments, and (2) easements for drainage of land and protection by dikes. The power to collect assessments for benefits conferred upon a parcel of land is not an easement but must be equivalent to and judged as a covenant running with the land.

Under the state statutes,[2] a Drainage District may exercise powers relating to irrigation,[3] drainage[4] and diking[5] of lands within its boundaries. The development of the law in relation to each of these fields is of importance in solving the questions above proposed, especially insofar as the resume throws light upon such functions with regard to the rights of the landowners affected collectively. A consideration of irrigation rights is first in order.

In the arid regions of the West, a novel body of law was created by the adoption of the customs of the miners relative to the appropriation of waters for use on non-riparian soil. The extension of the theory, somewhat modified, to lands apt for agricultural development by use of rarely available water, caused further doctrinal ramifications. Need and priority were the sole tests. The steel mold of ancient riparian law was broken. Necessity was the lodestar of public policy. Beneficial use of land and other potentials was vital. Where appropriation of water is recognized, a beneficial purpose must be served by all water used. An appropriation for a parcel of land where beneficial application is made, creates an incorporeal hereditament appurtenant to that parcel. This property interest ceases to exist by abandonment or inability to make beneficial use of the water, or by transfer of the water to another parcel. It is generally held that if an individual company or corporation covenants to deliver water to a specified piece of land, property rights appurtenant thereto in all

---

[1] The question whether the United States is required under somewhat similar circumstances to compensate a public body for the exercise of a public function when the United States is receiving the full benefit of the exercise of the function, but without considering the property rights, is discussed in United States v. Aho, 68 F.Supp. 358.

[2] The general subject of public drainage districts is treated in the statute as Title 123, Oregon Compiled Laws Annotated, entitled "Drainage and Diking Districts." Private irrigation and drainage districts and improvement companies, which have similar aims, are treated in Title 122, O.C.L.A.

[3] § 123-138, O.C.L.A.

[4] §§ 123-101 to 123-154, inc., O.C.L.A.

[5] § 123-118, O.C.L.A.; In re Scappoose Drainage District, 115 Or. 541, 547, 237 P. 684, 1117, 1118, 239 P. 193.

lands and dams, ditches, pumps and other works belonging to the covenantor and necessary to accomplish diversion and application, is brought into existence. The efficacy of such a transaction depends not on the principles of real covenants, but upon the fact that real property has been transferred.[6]

As noted above, if the owner of the parcel promises to pay for the water delivered for use upon the land, the devolution of this burden depends not upon the law of easements, but upon the law of real covenants. The past history, policy and tendencies of these intensely interesting creations is discussed in a learned little book [7] by Charles E. Clark formerly Dean of the Yale Law School and now Judge of the Court of Appeals of the Second Circuit. This acute analysis indicates that succession of estates of one of the parties to the covenant is the only proper meaning of the term "privity." In the same work, the illiberal treatment by some courts of the requirement that the covenant, in order to run, must touch and concern the land, is criticized.

This work is not cited nor analized by Lingle Water Users' Association v. Occidental Building & Loan Association, 43 Wyo. 41, 297 P. 385, which went against the current of the law relating to promises to pay for delivery of water to land.[8] In that case there had been a sale of water rights which became appurtenant to the parcel as an easement or incorporeal hereditament. As a consideration, there was a covenant by the landowner to pay the purchase price for the water right together with annual assessments for operation and maintenance of the delivery system. It was expressly stipulated that the burden of this covenant should pass with the land. The court held, in a suit against a subsequent grantee, that the covenant to pay did not run with the land and that there was no obligation for arrearages. This is placed partially on the ground that the water rights were real property and that the obligation to pay the purchase price does not pass to a vendee without express assumption. The court, in an elaborate opinion, holds that the obligation to pay operation and maintenance does not pass.

This case seems to indicate the extreme hardships created by the times. In the depression period, for several years irrigated lands were generally unable to pay the charges of the elaborate works whereby water was delivered. Conditions prevented the growing of profitable crops in irrigated projects. The burden of payments for water rights caused defaults, moratoria and a scaling down of debts and charges. In many projects both the original charges and the maintenance and operation assessments were conceived to be ruinous. In such projects a serious burden would have been placed upon the few solvent persons who acquired land in the district if they had been required to pay charges which no one else expected to pay. The effect of the decisions noted was that there was opportunity given to scale down the original costs of the district and in the future the benefit of the water received and the burden of the payments were more nearly equalized.

Several years later, the Oregon court cited and by dictum approved of the Lingle case in Cabell v. Federal Land Bank et al., 173 Ore. 11, 144 P.2d 297, 301. There, as in the Lingle case, a private company had sold water rights and agreed to deliver water over the years. The original owner covenanted to pay for the water right which became an incorporeal hereditament appurtenant to the land. This covenant was stipulated to create a lien and to run with the land. The court held that there was no lien created on the whole tract of 160 acres

---

[6] Stanislaus Water Co. v. Bachman, 152 Cal. 716, 93 P. 858, 15 L.R.A.,N. S., 359.

[7] "Real Covenants and Other Interests which Run with Land including Licenses, Easements, Profits, Equitable Restrictions and Rents." (1929)

[8] Judge Clark collects previous cases with regard to water rights in 52 Yale Law Journal 699, 719 n. 69: Bolles v. Pecos Irrigation Co., 23 N.M. 32, 167 P. 280; Horn v. Miller, 136 Pa. 640, 20 A. 706, 9 L.R.A. 810; Adamson v. Black Rock Power & Irrigation Co., 9 Cir., 297 F. 905, certiorari denied 266 U.S. 630, 45 S.Ct. 196, 69 L.Ed. 477; Ball v. Rio Grande Canal Co., Tex.Civ.App., 256 S. W. 678; Farmers' High Line Canal & Reservoir Co. v. New Hampshire Real Estate Co., 40 Colo. 467, 92 P. 290.

since there was a water right for only 81 acres. The court also held that a subsequent grantee could not be held liable for the assessments in arrears. The land had received no deliveries of water during his occupancy. For several years water could not be beneficially used upon the land because it was overflowed by seepage, part of it being used as a duck pond. This factor would prevent the delivery of water to the land and would cause the destruction of the water right. The covenant to pay would then have no basis. The Oregon court would have upheld a lien for the assessments if proper basis had been shown. The court say: "We are of the opinion that the covenants of the contract do not run with the land," citing the Lingle case.[9] This remark is made without discussion of a highly controversial subject and was not necessary for decision. The grounds are not indicated. It cannot be determined whether it was thought that the payment did not touch and concern the land.[10] There was no discussion of privity, although the covenantor and covenantee were in a close mutual relationship in which real property was transferred and also an easement in the lands of the covenantee.[11] The salient point in the case is that the land no longer received benefit. Nothing in this case indicates that a covenant to pay might not be upheld under proper circumstances,[12] or that a property interest in land might not be created by an obligation to pay assessments for an existing benefit such as delivery of water for beneficial application to the soil, or the maintenance of drainage canals and pumps to take away surplus waters.

The development from groups of landowners sharing a common source of indispensable water to private companies or corporations handling the supply, then to groups of landowners organized loosely to impose obligations which have statutory sanction, upon their respective lands, and finally to these entities of statutory genesis exemplified by the present Irrigation Districts, is interesting and important. These creations are charged with collection of assessments and the payment of construction costs and maintenance, and operation charges. It has been the most feasible form in which to provide for interaction and to assure payment for the works constructed. But it is the aggregate of the owners which constitutes the essential. The several parcels of land are interconnected by mutual easements and dependent on common sources of water. These property rights persist as appurtenances.

It is, then, without surprise that we find the Oregon court had placed upon a more substantial basis, the right to collect assessments in a public irrigation district. In Nelson v. McAllister District Improvement Co., 155 Or. 95, 62 P.2d 950, where the parcels were still able to make beneficial use of the water, the landowners had under statutory authority contracted to subject their lands to bonded obligations for the improvement thereof, with a direct stipulation that the obligation was to run with the land. The court held that a purchaser of the land at tax sale became one of the association of landowners by accepting possession under a tax sale; that the lien of bonds issued for improvements could be enforced against land in his ownership; and that the obligation was prior to a State Land Board mortgage given subsequent to the covenant, and was not affected by the sale of the land for taxes.

---

[9] Stanislaus Water Co. v. Bachman, supra, is cited also. This case holds that the successor to the water company which sold a water right which is an easement or interest in real property (see note 6 above) was bound to accept the annual installments set out in the contract of sale. It is not an authority for the proposition that covenants to pay for appropriated water rights do not run with the lands. In California, such covenants are governed entirely by code provision in any event. See Fresno Canal Co. v. Rowell, 80 Cal. 114, 22 P.

53, 13 Am.St.Rep. 112; Clark, 52 Yale Law Journal 699, 731.

[10] Tone v. Tillamook City, 58 Or. 382, 114 P. 938.

[11] The Oregon court has previously indicated that such a covenant will run. Ford v. Oregon Electric Ry. Co., 60 Or. 278, 117 P. 809, 36 L.R.A.,N.S., 358, Ann.Cas.1914A, 280; Houston v. Zahm, 44 Or. 610, 76 P. 641, 65 L.R.A. 799.

[12] A covenant to pay taxes runs with the land in this state. See Oregon & Western Colonization Company v. Strang, 123 Or. 377, 260 P. 1002.

In several particulars there is a vast gulf, both practically and theoretically, between irrigation and drainage-diking. Irrigation water can be withheld so that no use can be made of the land, [13] unless there is payment of assessments. Drainage-diking benefits cannot be withheld without substantial and irreparable injury to the community. The benefits are thus irrevocable to the land itself. By no possibility can it be held that they do not touch and concern both the benefited and the burdened land. In irrigation, when the easement for carriage is destroyed or the real property right to have the water is done away with by abandonment, failure to make beneficial use, or waiver, there is neither benefit or burden to touch and concern the land. The discussion of drainage and diking will show that these distinctions have been applied by the Oregon court.

■ The foregoing discussion of irrigation rights is collateral. No irrigation rights or concomitants thereto are here involved. The previous resume of such cases seemed necessary to show a holding in an irrigation case need not apply elsewhere. But it will be clear that the levying of assessments in a Drainage District, particularly one which has erected dikes for flood protection, is a property right which belongs to the aggregate of the owners within the boundaries and is simply entrusted to the District in order to permit collections and payments to be made under authority of the state. The public interest in reclamation and protection against flooding of agricultural land dictates this solution.

When drainage is considered, we are dealing not with a newly created right of property such as the irrigation rights which stem from the custom of miners, but those which have roots deep in the common law. The right to discharge surface waters by ditch over a neighbor's land is a common law easement. It is so recognized and given effect in this state. A drainage easement is a continuing benefit and an inseparable adjunct of the particular parcel. It can, of course, be destroyed, but only in accordance with common law doctrines.

Drainage can only apply to particular parcels of a watershed, usually. In any event, it is limited by the natural laws of the flow of water. The lands of such drained areas are of necessity bound by mutual easements. The landowners collectively have corresponding rights and obligations. The public purpose of reclamation often cannot be accomplished without extensive works. This requires some form of obligation which can be enforced against the land and landowner.[14]

In a situation twice considered by the Oregon Supreme Court,[15] the owners of three adjoining tracts partitioned the same so that one of the parties became owner of two tracts and the other of one tract. One of the deeds contained a covenant by grantee to keep open and in good order two ditches across the tracts acquired by him in order to properly drain the land deeded to the other party. Thereafter, an agency of the federal government acquired the burdened land. A recovery of damages was sustained. The court adopts a quotation as follows:[16]

"Covenants the benefit or burden of which may thus pass to subsequent owners of the land are said to 'run with the land.' Rights created by such covenants in favor of or against transferees of the land are strictly in personam, and not in rem; but as incidents of the land, following it into the hands of subsequent owners, they are

---

[13] This feature of loss of benefits distinguishes People of Puerto Rico v. United States, 1 Cir., 134 F.2d 267, and United States v. Anderson Cottonwood Irrigation District, 19 F.Supp. 740. See United States v. Aho, 68 F.Supp. 358.

[14] Without entering the controversy over the Restatement, these charges are protected therein as obligations running with the land, although the exact subject is not discussed. § 537 Restatement of Property, Division V, Servitudes (formerly draft § 85). See comment of Sims on this section in connection with irrigation covenants. "The Law of Real Covenants" by Henry Upson Sims, 30 Cornell Law Quarterly 34–35.

[15] Guild v. Wallis, 130 Or. 148, 279 P. 546; Guild v. Wallis, 150 Or. 69, 40 P. 2d 737, 41 P.2d 1119, 42 P.2d 916.

[16] Guild v. Wallis, 150 Or. 69, 81, 40 P.2d 737, 742, 41 P.2d 1119, 42 P.2d 916.

somewhat similar in effect to proprietary rights in another's land * * *." [17]

This case goes further than it is necessary to go here. There was no question about the easement. There was an open and notorious drainage ditch such as the common law has always recognized as a legal interest. But the covenant was by the owner of the servient parcel and was a covenant to perform affirmative acts which would result in a further benefit to the dominant land. In this case, the affirmative act of payment is required but only in return for the continuing benefit.

Intimately and inseparably connected with drainage in many situations is the protection of land by diking as practiced in this District, under general statutory authority whereby part of the cost of these works is chargeable to this particular tract which the United States is condemning. By nature, all lands subject to overflow by high tide or inundation of tidal rivers, will receive protection from a wall built across the foreshore. In England such embankments are commonly called "sea walls," but the same principles apply where the dikes protect land from overflow by inland waters [18] and especially by the great tidal rivers, comparable in this respect to the Columbia River.

The "group of peasant farmers who, in the grey morning mists, had time out of mind walked the marshes of Wandsworth and Greenwich," were the ancestors of the present groups which are denominated the Multnomah Drainage District.[19] The customs which lie at the basis of the governing statute here and were administered by the "primative organization of the denizens of the marsh" are of "great antiquity." [20] "Far back in the days before the common law the communities which inhabited the many low lying districts developed primitive machinery and local customs to deal with the problem which nature had set them." The body of law thus founded has been remarkably permanent. And so from earliest times and by common law, an obligation was imposed upon the owners, at the time in possession of lands on the "level" so protected from flooding, to pay pro rata according to acreage,[21] for maintenance, repair and reconstruction of drains and embankments against floods. An act of the time of Henry VIII upon the subject, stands intermediate between enactments medieval and modern which crystalize and regularize these customs as property rights. It was provided that the commissioners under commissions issued under the act, should erect, repair and survey "the said walls, streams, ditches, banks, gutters, sewers, gotes, calcies, bridges, trenches, mills, mill-dams, flood-gates, ponds, locks, hebbing-wears, and other impediments." [22] Therein "it was further provided, that if the landowners did not pay the charges assessed upon them, the commissioners could sell the land and give a good title to the purchaser provided that the order for sale was assented to by the Crown. Such orders were to bind the land—Crown lands as well as the lands of private persons." [23] Such assessments "shall bind all and every person and persons, that at the making of the same decree had any interest in such lands, tenements, or hereditaments, in use, possession, reversion or remainder, their heirs and feoffees * * * and * * * shall bind as well the lands, tenements, and hereditaments of the King our sovereign lord, as all and every other person and persons, and their heirs, for such their interest as they shall fortune to have, or may have, in any lands, tenements or hereditaments or other casual profit, advantage, or

---

[17] 2 Tiffany on Real Property (2d ed.) § 388, 1401.

[18] "* * * by maintaining the defenses of the fresh Inland Rivers, to cause them to keep their Waters within their Chanels." Callis, Reading in 1622 before Gray's Inn on the statute 23 Henry VIII usually cited from the second edition (1685) as Callis on Sewers (Drains).

[19] Webb, Statutory Authorities, 106.

[20] Callis, Reading 23.

[21] Holdsworth's History of English Law (1938) Vol. X, p. 199, citing Neilson, A Terrier of Fleet Lincolnshire (British Academy) xvii–xviii, xxii–xxiii, xlvi–xlviii, which is presently unavailable.

[22] 23 Henry VIII, chap. 5, § 3.

[23] Holdsworth's History of English Law (1938) Vol. X, p. 203.

commodity whatsoever they be, * * *." [24]

In the second edition [25] of the Reading of Callis, there is a note which shows that the obligation to pay the assessments, although not a lien, ran with the land even though the title was in the Crown. It is said:

"The Lands of the King are not exempted from being taxed by virtue of the Commission of Sewers: and therefore in the Case of Whitley and Fawset, Pasch. 23 Car. I. B. R. where it appeared, that there were 800 Acres of Land in the hands of the King, which were not taxed, as by Law they ought: it was held that the tax laid upon the other persons within the level was unjust and illegal, because by the not taxing of those 800 Acres, a greater burthen was laid upon the rest of the Land within the Level, than of right ought to be, for that the King's Lands are taxable by the Statute, Style 13."

We thus arrive at the foundation of a proprietary interest held in the land benefited by drainage and diking by owners of other lands of the "level" such as was recognized in a similar situation between private owners in Guild v. Wallis, supra.[26] The State, as we saw in Nelson v. McAllister District Improvement Co., supra,[27] will recognize this peculiar proprietorship in lands owned by the state.

But it may further be shown that this property interest is one known and recognized as a distinct estate by the common law. In the case of Morland v. Cook [28] there was a covenant by all the owners of land under deed of partition to pay pro rata the cost of repairs to such a dike. It was held the burden of making payments in accordance with this covenant ran with the land. Thus it was demonstrated to be a property right in the land benefited by the protection. This case contained an explanation [29] elaborated upon later because it was an apparent reversal of the trend of English decision narrowly limiting the burdens which ran with the land. The emphasis was laid upon the common law obligation running with the land of the owner to pay for such repairs. The promise to pay is, then, designated as a "rent charge" upon the fee. In England, in the absence of such a covenant, the common law duty is nevertheless enforced by administrative or quasi-judicial bodies known as the "Commissioners of Sewers," [30] or "Lords of the Level".[31] Since the obligation was created by the necessities of the situation and was in the public interest, it ran with the land and bound subsequent landowners because of the constant benefits, and may well be described as a property right in favor of the aggregate of the property holders on the "level."

The analogy of a rent charge is very serviceable here. It is incorporeal in nature but it was thought of as a thing. Rent is regarded as a legal charge upon the land out of which it issues.[32] Ground rents have no place in the law of Oregon because the customs of the people have not called for the creation of such incidents. But this type of property, which was understandable to the strict technicians such as early common law conveyancers, serves to explain the property right which exists here. It may be objected that rent charges are by nature consensual. A statute of 1797 (37 Geo. 3, c. cxlvi), as a proper compensation for the extinguishment of certain vicarial tithes and other offerings, affixed an annual rent charge through assessment by acre-tale, of all the lands and grounds in the parish with certain exceptions. In Christie vs. Barker,

---

[24] 23 Henry VIII, chap. 5, §§ 8 and 9.
[25] 1685.
[26] 150 Or. 69, 40 P.2d 737, 41 P.2d 1119, 42 P.2d 916.
[27] 155 Or. 95, 62 P.2d 950.
[28] L.R. 6 Eq. 252.
[29] Austerberry v. Corporation of Oldham, 29 L.R., Ch.Div.1885, p. 750; 15 Eng.Rul.Cas. 258.
[30] Blackstone's Commentaries, Book III, 73, 74, Cooley's (4th ed.) Vol. II, p. 909; the case of Rex v. Commissioners of Sewers for Essex, 1 B. & C. 477 (E.C.L.R. vol. 8) 107 Reprint 177.

[31] Webb, Statutory Authorities, 38–39.
[32] "The Incidence of Rent" by T. Cyprian Williams, 11 Harvard Law Review 1, 9. It is interesting to note that this term is used by the Ninth Circuit Court of Appeals to explain the Washington law regarding the assessments of an irrigation company against benefited lands. It is said: "The sale of the perpetual use of a thing is the sale of the thing, whatever ground rent or other charge be reserved." Adamson v. Black Rock Power & Irrigation Co., supra [297 F. 912].

374

these rent charges were upheld and the vicar was permitted to sue those in arrears in payment of these rent charges in the action of debt.[33] The legislation imposing the assessments upon these lands might well be justified as a statutory rent charge.

It is claimed that it is contrary to public policy for the United States to be burdened with extraordinary conditions attached to land, or to be required to take notice thereof. The state accepts this burden as to state lands. In England, as we have seen, the King accepted such burdens as to Crown lands. These conditions were laid by nature. Neither private individuals nor government agents could escape notice of the fact that these lands would be of no value without diking protection. In Morland v. Cook, supra, grave emphasis is laid upon the fact that where natural conditions are such that a parcel of land would necessarily be subject to inundation unless dikes were preserved, notice of the need of protection and the necessity of cooperation therein by contributions of money for maintenance and construction is inevitable and unescapable.[34]

Notice was thus conveyed by the natural conditions as they existed, and exist now, on the ground. The case of Guild v. Wallis, 130 Or. 148, 155, 279 P. 546, 548, lays down the consequences to the successor in title along the same lines as follows:

" 'On the same principle,' says Mr. Pomeroy, 'if the owner of land enters into a covenant concerning the land, concerning its use, subjecting it to easements or personal servitudes, and the like, and the land is afterwards conveyed or sold to one *who has notice* of the covenant, the grantee or purchaser will take the premises bound by the covenant, and will be compelled in equity either to specifically execute it, or will be restrained from violating it; and it makes no difference whatever, with respect to this liability in equity, whether the covenant is or is not one which in law "runs with the land." ' 2 Pomeroy's Equity (3d Ed.) § 689." [Emphasis supplied.]

■ Of course it cannot be contended that in this situation there are any covenants or rent charges here. But the necessities of the situation are such that a common law obligation was imposed in England for a portion of the benefit and here there are obligations placed by statute

[33] In the Court of Appeal, 1884, 53 L. J. Queen's Bench Div. 537.

[34] "The Case of Rex v. Commissioners of Sewers for Essex, 1 B. & C. 477 (E.C.L.R. Vol. 8) lays down as a proposition of undoubted and unquestionable law that all persons enjoying the benefit of a sea-wall are bound, and are liable at common law, to repair and maintain it in the absence of special custom or in the absence of any contract for that purpose. That, in my opinion, establishes this proposition as a necessary consequence, that where a man buys land below the level of high-water, and which would be daily covered by the overflow of sea water were it not prevented by the obstacle of a sea-wall, the purchaser has notice, and is thereby made aware, that by law, unless for some custom or some special contract exempting him, he is liable to contribute to its repair. He cannot in that state of circumstances be allowed to say that he did not know of it. He must be taken to know that his lands are below the sea level. That being so, he must be taken to know that but for the sea-wall they would be overflowed by the tide, and the consequence follows that if he is called upon to contribute towards its maintenance, he must show how he is exempted, and how the sea-wall is to be maintained without his cooperation."

"This principle of the obligation of making inquiry arising from the nature of the property is of constant application in the English law. I may, however, refer to the case of Pyer v. Carter, 1 H. & N. 916, where the Court of Exchequer held that although the purchaser of a house did not know of a drain at the time of the conveyance to him, yet, as he must have known that the water from the house must drain somewhere, he was put on inquiry, and that those things must be treated as known to him which would have become known to him if a careful examination had been made on the subject by a person conversant with such matters. I am of opinion, therefore, that both Cook and Finn were, when they were about purchasing these lands, set on inquiry as to how the tidal water was excluded from their land, and that this being accomplished by the Bromhill Sea-wall, they were set on inquiry to ascertain how that sea-wall was maintained, and that the burthen of proof lies on them to show that they are not now bound to contribute."

which are analogous to those placed by way of covenant or rent charge. Likewise, the notice of the burden set out in express terms in the statutes should be as binding as notice of private covenant by inclusion in a deed. In view of these considerations, it would be a matter of supererogation to discuss whether the statute of Henry VIII was adopted as a part of the common law [35] in Oregon where entirely different enactments control. The necessity of contribution of Crownlands was not imposed by that statute nor even by the common law, but by the peculiar circumstances. The existence of like circumstances on the lands included in this District laid the basis for the enactment of similar legislation regarding state lands. In the end, reliance is placed on an obligation imposed by nature and confirmed by common custom of over a thousand years, to pay assessments in return for protection without which the lands would be useless. Therefore, it should be concluded that there is a property right in the District, as representative of the landowners, to receive the annual assessments from the lands continuously benefited.[36] Thus, as the United States is taking this parcel of land and destroying the right of the landowners in the aggregate, to levy upon the parcel, the government is bound to pay for the property right so destroyed.

If there be any doubt that the right of assessment is a property right, there is still another method of viewing the situation. In this case the benefit of the easement or real property right bestowed by virtue of the continued existence of the drainage and pumping systems, is still present.[37] It has not been lost or abandoned as was the right in the Cabell [38] case, by failure to make beneficial use of the water on the land. These works will drain and protect the land according to the allegations of the answer, forever. These rights in the drainage works and in the dikes, are inseparably connected with, and appurtenant to the benefited lands, and are incapable of existence apart from these particular lands.[39]

According to the ancient Chudleigh's case,[40] rights such as these, appurtenant, pass with the fee into the hands of any possessor of the lands, including a wrongful taker, holder, or even disseisor. This is present day law also.[41] Obviously, such hereditaments appurtenant to the fee of the condemned parcel passed to the government [42] and must be paid for in addition to the fee.

▮ The District should receive the money in trust for the aggregate of the landowners. The state created this public

---

[35] See Bishop v. Tripp, 16 R.I. 198, 14 A. 79.

[36] See position of the Restatement of Property, Division V, Servitudes, § 565 and illustrations and comments.

[37] "And the question is, "What has the owner lost? not, What has the taker gained?" Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725; 31 Columbia Law Review 1.

[38] Cabell v. Federal Land Bank, supra.

[39] Thompson on Real Property, perm. ed., § 335.

[40] 1 Rep. 120a, 122b; 76 Reprint 270, 279.

[41] At least the Restatement lays down that a drainage easement passes to the wrongful possessor of the lands. Restatement of Real Property, Division V, Servitudes, § 487 and comments.

[42] Deavitt v. Washington County, 75 Vt. 156, 53 A. 563. Easement of drainage ditches pass with the fee without mention in condemnation proceedings. It

is there said: "In the latter case, of which easements like the one in question are a conspicuous example, when the right is once acquired, whether by prescription, grant, or covenant, it attaches to the land for the benefit of which it was acquired, and sticks to it so fast that it goes with it, regardless of privity, into all hands, even those of a disseisor. It is immaterial, therefore, whether the County acquired the easement specifically by its condemnation proceedings, for it sticks to the land, which confessedly it did acquire." Thompson on Real Property, perm. ed., § 335. Simmons v. Winters, 21 Or. 35, 44, 27 P. 7, 28 Am.St.Rep. 727; Coventon v. Seufert, 23 Or. 548, 32 P. 508. An easement is something additional to the ordinary rights of property embraced in fee. Rowbotham v. Wilson, 8 E. & B. 123, 92 E.C.L. 123, 120 Reprint 45. In condemnation, sewers in private ways pass to condemnor. Beals v. Brookline, 245 Mass. 20, 139 N.E. 492.

corporation which had powers to protect the lands from flood by the building of dikes or levees. The powers of such a public corporation were granted by general act. This District, therefore, had the power to borrow money for these purposes and build these levees, or dikes, which are alleged to have been constructed under the law. As a concomitant thereto, by virtue of its reclamation of the lands, which all have the benefit of these dikes and the drainage ditches, the District has the power to levy assessments to pay indebtedness for the cost of construction of the works and the cost of operation and maintenance. In the case of drainage, each parcel has appurtenant to it an easement in all the ditches, the parcel of ground on which the water flows and the pumping system for disposal. As to each parcel, it has the visible protection of a dike which the individual landowners were, under a common law duty, to construct, repair and maintain. These works operate for the common benefit of all the lands in the District which is really set up as a clearing house to operate the system and to pay the costs thereof out of the assessments, the scale of which has been judicially determined. The District does not hold these property rights but operates them for the benefit of the combined landowners. The only remedy of the creditors is to force a levy of assessments by mandamus. No execution can be levied against its property because it has none not burdened by trust. Any money paid the District must be applied upon the cost of the works, or operation and maintenance, and thus relieve the burden of the future assessments on the lands.

The situation of the Drainage District may be conceived of as the same as a company formed for such purposes by private covenant except that the District is a public corporation.[43] The combined owners represented by the District must maintain the ditches, dikes and pumps, and furnish this service to the government. The government by taking the land took the benefit of these services and must pay therefor. So far, the United States has only proposed to pay for the fee simple title without the appurtenant easements.

 If we follow the law as laid down in the Second Circuit [44] there would seem to have been no necessity for the elaborate development of the argument. But these opinions are not necessarily binding upon the courts of the Ninth Circuit. There are sufficient facts stated in the answer to require that the demurrer be overruled. The method of computing the amount of compensation must be left for the trial.[45]

The demurrer is overruled.

43 Neponsit Property Owners' Ass'n, Inc., v. Emigrant Industrial Savings Bank, 278 N.Y. 248, 15 N.E.2d 793, 118 A.L.R. 973.

44 Brooklyn Eastern Dist. Terminal v. City of New York, 2 Cir., 139 F.2d 1007, 152 A.L.R. 296.

45 It is probable that the only proper solution is to make compensation to the District over and above the fee simple value. See "The Measure of Compensation in Eminent Domain" by Charles T. McCormick, 17 Minnesota Law Review 461ff; "Legal Concepts in Cases of Eminent Domain" by Joseph M. Cormack, 41 Yale Law Review 221ff; "Measure of Compensation in Condemnation" by Ralph W. Aigler, 1945 Wisconsin Law Review 5.