313 P.2d 424

Herman W. KENGLA and Mary J. Kengla, his wife, and James M. Sawtelle and Ruby L. Sawtelle, his wife, for themselves and others similarly situated, Appellants,

v.

Virgil P. STEWART and Wilma M. Stewart, husband and wife; Leo C. Rice and Margaret M. Rice, husband and wife; Hillary C. Nunnink and Dorothy Nunnink, husband and wife; on behalf of themselves and others similarly situated, Appellees.

No. 6252.

Supreme Court of Arizona.

July 2, 1957.

Joseph B. Judge and Lawrence E. Holladay, Tucson, for appellants.

May, Lesher & Dees, Tucson, for appellees.

PHELPS, Justice.

This is an appeal from a judgment in favor of plaintiffs-appellees and against defendants-appellants, the nature of which will be more particularly set forth hereafter. The parties will be hereinafter referred to as plaintiffs and defendants as they are designated in the trial court.

The facts are that early in the year 1925 Judge Sawtelle (then judge of the Federal Court District 2 in Arizona) joined his wife in subdividing 160 acres of desert land

outside the limits of the City of Tucson. The tract was divided into 158 lots.

Judge Sawtelle died in 1934. During his life he and his wife executed and delivered only 15 deeds, conveying title to lots sold in said subdivision, 13 of which contained the following provisions:

"The parties of the first part hereby convey to the parties of the second part a one one-hundred-and-sixtieth (1⁄160) interest in the well and equipment and water system now or hereafter located on said addition, upon condition, however, that the said parties of the second part, their heirs and assigns shall, when the owners of a majority of the lots in said adddition shall so request, convey said one one-hundred-and-sixtieth (1⁄160) interest in said well and equipment and water system, to a trustee in trust for the use and benefit of all of the owners of lots in said addition, subject to such rules and regulations as such trustee may prescribe, or to a water users' association to be organized by the owners of lots in said addition, as such owners of lots may determine, and subject to such regulations and by-laws as such association may prescribe.

"The parties of the first part further agree that until such time as the owners of the majority of said lots in said addition shall request the transfer of said one one-hundred-and-sixtieth (1⁄160) interest to such trustee or such water users' association as above provided, the parties of the second part shall have the right to obtain water for use on said lot from said water system, provided they shall install and maintain in good order a first-class water meter and service pipe, said service pipe not to exceed one (1) inch in diameter, and shall pay his, her, its, their proportionate share of the cost of the pumping and delivery of such water, such cost to be determined on a meter basis.

"It is hereby understood and agreed that the said water right runs with and is appurtenant to the land. No future transfer of said water right or interest in said water system shall be valid unless made to the future purchaser or purchasers of said land."

There is also contained in said deeds a number of restrictive covenants which it is not necessary to quote. A deed executed in November, 1927, did not carry any provision relative to the water rights. However, in October, 1934, Judge Sawtelle and wife executed a correctional instrument incorporating therein the clauses quoted above.

Upon the death of Judge Sawtelle and his wife, the remainder of the lots in said tract were inherited by W. H. Sawtelle, Jr. and James Sawtelle, sons of the deceased. W. H. Sawtelle, Jr., became bankrupt in 1945 and in April 1946, 52 lots

owned by him were sold and conveyed to the plaintiff and wife, and to one Herman O. Rasche and wife, by the trustee in bankruptcy. The conveyance was made by quitclaim deed and simply showed the authority of the trustee to make such conveyance subject to *conditions*, restrictions, reservations, *easements*, etc., and subsequently, W. H. Sawtelle, Jr., executed a deed conveying the same lots (52 in number) to the said Kengla and Rasche, which included the following clauses:

"Subject to taxes, conditions, restrictions, reservations, easements, and/or rights of way of record.

"Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof.

"To have and to hold, all and singular the said premises, together with the appurtenances, unto the said parties of the second part, and to their and assigns forever."

Kengla and Rasche had theretofore on September 25, 1945, entered into an agreement between themselves whereby they agreed that, upon the delivery of a grant deed executed by George T. Goggin, trustee in bankruptcy of the estate of William Henry Sawtelle, Jr., a bankrupt, conveying to Kengla and wife and Rasche and wife the 52 lots owned by said bankrupt estate; that thereupon, Rasche and wife " * * * shall forthwith convey to Henry W. Kengla and Joaquina R. Kengla, all their interest in the following described realty and water rights appurtenant thereto," and the said Kengla and wife agreed to convey to Rasche and wife, 29 lots described therein, "together with all water rights appurtenant thereto", thus recognizing that the water right was appurtenant to the lots.

Judge Sawtelle distributed the water to the purchasers of lots until his death and thereafter James Sawtelle took over the operation of the distribution of water to the purchasers of said lots and operated it until 1948. Under what conditions or arrangements they operated said water system is not shown. What disposition James Sawtelle made of the lots owned by him is not shown except that, the records disclose he sold and conveyed a few lots, including 18 lots conveyed to High School District No. 4 of Pima County. This conveyance was made in 1949. However, in July 1948, James Sawtelle purported to transfer, by bill of sale, all of the water rights to 62 lots without legal description, to defendant Kengla. The records disclose that previously thereto he had conveyed 4 lots, together with $\frac{1}{160}$ interest in the well, equipment, and water system to others, and strangely enough, the latest conveyance was in the early part of July, 1948, only a few days before the purported sale

and transfer of the water rights to 62 lots to Kengla.

Upon the purported conveyance of the water rights to 62 lots by James Sawtelle to Kengla, the latter took over the operation of the water system and has been operating it ever since.

In the years of 1948, 1949 and 1950 a majority of the lot owners in the Sawtelle subdivision, totaling 81 lots, entered into an agreement with each other, in which they appointed three trustees to take over the well, equipment and water system and, to operate the same for the benefit of all of the lot owners in said subdivision under the provisions of the deed as above set forth. At that time they made request upon Kengla to join with them and he refused, saying that, he was the absolute owner of the water system. They brought this action against him in 1950, but for some reason the case lay dormant for over five years. The complaint was then amended, trial had, and judgment was rendered in 1955 declaring in substance that the purchasers of lots in the Sawtelle Addition are the owners of the well, equipment and water system, according to the intention and plan of the subdivider as evidenced by the deeds carrying the provisions quoted above; that under such provisions, the trustees selected by a majority of the lot owners are entitled to the title and possession of the well, equipment and water system, and to the management and control thereof, under such reasonable rules and regulations as they may prescribe.

The judgment of the court made an interlocutory restraining order, theretofore issued by it, permanent, restraining defendants from cutting off the water of the lot owners. The interlocutory restraining order was issued by the court as a result of representations made to it that Kengla, in August, 1955, had sent out bills for water service previously rendered and consequently in arrears, demanding payment within 10 days, and threatened that if payment was not made within such time water service would be discontinued.

The evidence discloses that Kengla had been furnishing this service since 1948, and that several thousand dollars for such services were due and owing from the lot owners; that he had made improvements upon the water system, including the installation of a new pump at the original well, and the replacement of pipes and other equipment amounting to several thousand dollars. It also disclosed that he had bored another well and had tied it on to the water system at considerable expense.

At the close of the case the court permitted defendants to amend their answer showing these charges for service rendered and expenditures made in improvement of the water system, and prayed that the court determine the amount due defendants for such service and expenses incurred in

improving the water system. The court, however, in rendering judgment failed to determine whether defendant was entitled to compensation therefor, stating that there should be further testimony on this issue, in the event it was determined that plaintiffs were entitled to the ownership of the well, equipment and water system.

The trial judge found in his memorandum that, a total of 25 lots conveyed by Judge Sawtelle and wife and by W. H. Sawtelle, Jr. and James Sawtelle, heirs and successors in interest, in and to said lots, conveyed a 1/160 interest in the well, equipment and water system to purchasers of lots, and he further found that 77 of the lots conveyed by them contained a distinct provision or agreement that the purchase of a lot also included the purchase of a 1/160 interest in the well, water system and equipment.

There is a clause in all of the deeds included in the record (with the exception of a deed executed by James Sawtelle to High School District No. 4 of Pima County) which conveys the lot therein described, together with the appurtenances thereto. The conveyance to the High School, bearing date May 18, 1949, contains no such clause. This was subsequent to the attempted conveyance by Sawtelle of the water rights appurtenant to 62 lots in said addition to defendant Kengla, which was executed July 29, 1948.

The record does not disclose the description of the 62 lots to which the water rights were attempted to be transferred by James Sawtelle to Kengla.

Defendants first assert that the court erred in finding that the evidence shows a general plan on the part of Judge Sawtelle for the sale of the lots, together with the well, equipment and water system as an appurtenance thereto, which was to run with the land. We do not think there is any merit to this position. The Court will take judicial notice of the fact that the land in close proximity to Tucson then, as well as now, was desert in character. Development of water readily available to the purchasers of the lots in the Sawtelle Addition was vitally necessary to the establishment of homes on said lots, and living in them by purchasers thereof.

At that time there were few, if any, private water companies in the desert area of the state engaged in development and service of water for domestic purposes. Furthermore, it is apparent from the number of lots sold during the life of Judge Sawtelle (9 years), that such a company could not have survived. Judge Sawtelle unquestionably realized this and, in order to make the lots attractive to persons desiring to own their homes, bored a well and installed a pump and piped water to the lots purchased. This conclusion is clearly to be inferred from the language used in the deeds in referring to the well, equipment and water system "now or hereafter located on said Addition." It was stipulated that

the well involved here was bored on the east 71.07 feet of Lot 7, Block 1, where it is now located. With the exception of the deed to High School District No. 4, in all of the deeds executed is incorporated either the provisions above quoted or a clause conveying the appurtenances to said lots to the purchaser. Some of them contain a clause reading "subject to * * * conditions, provisions, covenants, reservations and restrictions of record in the county recorder's office, Pima County, Arizona." Doubtless these refer to the deeds executed by Judge Sawtelle and wife, from which we quoted above, because there are no restrictions otherwise recorded. Some of the deeds are subject to conditions, reservations, restrictions, etc., as found of record in deeds executed by the original subdivider. As above stated, all of them convey the appurtenances with the land except the school deed, supra.

The legal effect of those provisions was a declaration of the character of the property rights being conveyed to the purchasers of lots, and providing a plan for the development and operation of the water system expressly conveyed by the terms of the deed. It provided for the furnishing of water to all lot owners until a majority of the owners of all of the lots requested that the $\frac{1}{160}$ interest in the well, equipment and water system be conveyed to a trustee or water association, as the owners may determine, subject to such rules and regulations as might be prescribed.

The deeds further provided that during such time the lot owners were to be provided with water for domestic use and were to share pro rata with other lot owners the cost of pumping and distribution thereof.

There was a proviso in said clause that the lot owner was to install and maintain, in good order, a first-class water meter and service pipe not to exceed one inch in diameter. If any meters were installed they appear not to have been in use when Kengla took charge of the water system as he has been charging a flat rate for water service, but this is immaterial. Failure by Kengla and his predecessors in interest to require such meters to be installed constitutes a waiver of any and all right to predicate a defense thereon in this cause of action.

The plan, as above pointed out, provided for the ultimate ownership of the well, equipment and water system to be vested in a trustee or trustees, for the use and benefit of the lot owners and that the operation of said water system was to be under the direction of such trustee or trustees. In other words, it conveyed a benefit to the grantee as an incident to the land conveyed as distinguished from a restrictive covenant imposing a restriction or burden thereupon. This distinguishes the instant case from O'Malley v. Central Methodist Church, 67 Ariz. 245, 194 P.2d 444.

We therefore hold that the evidence is ample to justify the finding of the trial

court that it was the intent and purpose of Judge Sawtelle to vest the water system, including the ownership in the well and equipment, in the owners of the lots; that the right to the use of the water developed should be and was made appurtenant to the soil, to run with the land, and that the water should never be separated therefrom.

The purchasers, in accepting these deeds of conveyance, assented to said provisions and unquestionably relied thereupon as one of the primary inducements to purchase. It is certainly clear from the agreement between Kengla and Rasche that they took their deeds to the 52 lots with the understanding they were getting the right to the use of the water "appurtenant thereto."

■ The fact that deeds were executed by both W. H. Sawtelle, Jr. and James Sawtelle after the death of Judge Sawtelle, which did not expressly set out the clause in the deed above quoted, does not affect the validity of the plan and design of the original subdivider and their covenant with the purchasers. Each of such deeds (with one exception) did expressly convey the lots, together with all appurtenances thereto in anywise belonging, which we believe had the legal effect of conveying the well, water system and equipment as effectively as if the clauses originally incorporated in the deeds executed by Judge Sawtelle had appeared in every deed executed. They both executed deeds containing said clause after the death of their father. See, Platner

v. McMartin, 139 Neb. 814, 299 N.W. 182, 183. In that case a tile pipe ten inches in diameter was laid under the highway by Platner, by permission of the county, for a distance of three blocks where it hooked on to the city sewer system as a means of disposal of sewage from his home. He later sold his home and conveyed it to the purchaser, together with the appurtenances thereto. The court held that the word "appurtenance" had the legal effect of conveying the sewer tile connecting the house with the city sewer system along with the real property. See also, McClintic-Marshall Co. v. Ford Motor Co., 254 Mich. 305, 236 N.W. 792, 77 A.L.R. 807. The case of St. Louis-New Orleans Nav. Co. v. Hynicka, 36 Ohio App. 94, 172 N.E. 687, 688, defines an appurtenance as "a thing belonging to another thing as principal and which passes as incident to the principal thing." The case of Hutcheson v. Sumrall, 220 Miss. 834, 72 So.2d 225, is splendid authority in support of the conclusion herein reached. See also, Whalen v. Manchester Land Co., 65 N.J.L. 206, 47 A. 443.

■ Defendants next complain that the court erred in refusing to find that they had proved adverse possession. This is likewise unsound. Judge Sawtelle handled the business of distributing water during his life, and James Sawtelle handled the business thereafter until he turned it over to Kengla on July 29, 1948, by purportedly transferring to him the water rights to

62 lots in the Sawtelle subdivision without legal description, by a bill of sale. On July 7, 1948, James Sawtelle had conveyed a lot in said subdivision containing the provisions above quoted, which, as above stated, appeared in 13 of the 15 deeds executed by Judge Sawtelle. So far as the records disclose, there was never any intimation that either Judge Sawtelle or his son James claimed a hostile or adverse interest in the well, water system or equipment to that of the other lot owners. We find nothing in the acts of Kengla that would indicate a hostile adverse possession by him. His notice to them that he intended to improve the water system or, in making charges for water services, certainly did not have that effect. Under the provision of the deeds of conveyance as above set forth, each lot owner was expected to pay his pro rata cost of maintenance and operation. Even a threat to cut off their water if they did not pay did not denote adverse possession. It was their duty to pay for the service received, and Kengla had a right in some manner to enforce collection thereof.

These deeds each had the effect, not only of conveying a $\frac{1}{160}$ interest in the well and equipment located on the east 71.07 feet of Lot 7, Block 1, purchased by defendants, and of the entire water system but, they conveyed as an appurtenance thereto, an easement upon Lot 7, Block 1, necessary to the proper maintenance of the equipment located thereon, and operation of said water system. It was continuous and apparent and passed to the purchaser by the use of the word "appurtenance" in the deed. Waubun Beach Ass'n v. Wilson, 274 Mich. 598, 265 N.W. 474, 103 A.L.R. 983; Relovich v. Stuart, 211 Cal. 422, 295 P. 819.

The possession of Lot 7, Block 1 by either Kengla or James Sawtelle, or both, did not constitute open, notorious and adverse possession of the well, equipment and water system appurtenant thereto, as required by law.

■ The next question raised by defendants is laches. It will be remembered that defendants and their associates, Rasche and wife, in March, 1946, became the owners of 52 of the 158 lots in said subdivision with the definite understanding that the water rights were appurtenant to and ran with the land, and that said water right was inseparable from the land. This conclusion is inescapable because they had entered into a contract with each other in September, 1945, wherein each agreed to convey to the other a given number of lots, "together with the water rights appurtenant thereto." They both had knowledge of the provisions of the deeds executed by the subdivider conveying a $\frac{1}{160}$ interest in the well, equipment and water system. Rasche and wife had accepted a deed from James Sawtelle, November 6, 1947, conveying Lots 6 and 8 in Block 7 of that subdivision containing the same provisions as we quoted

earlier in this opinion, which were contained in the deeds of the subdivider.

Whatever rights Kengla and Rasche acquired to the well, equipment, water and water system they got from the bankrupt estate of W. H. Sawtelle, Jr., and from the bankrupt individually, as evidenced by the deeds of conveyance of said lots and the appurtenances thereto.

■ It further appears that as soon as plaintiffs learned that Kengla claimed to be the exclusive owner of the well, equipment and water system when he refused to join with them in the appointment of trustees to take over the water system, they brought action against him. Hence, we believe, that the charge of laches is not sustained by the evidence notwithstanding the delay in its prosecution. It was not shown that defendants have suffered any injury as a result of the delay. Furthermore, it appears to us that after Kengla became the owner of a large number of lots in said subdivision he should have been as much interested in having any controversial matters instituted in the courts speedily determined as any individual lot owner therein. Mere delay of itself is not laches unless it works to the injury of another. May v. Roberts, 133 Or. 643, 286 P. 546. See 24 Words and Phrases, Laches, p. 100.

■ Defendants complain that the court erred in admitting several advertisements in The Daily Star, a Tucson newspaper, beginning February 15, 1925, and ending April 12, 1925, advertising Sawtelle subdivision as being a desirable location for homes, stressing the quality of the soil, the abundance of water, and the opportunity to grow gardens, fruits, flowers, etc. The ads were run by the Tucson Realty & Trust Co. and asked that persons interested call Sam Elrod. Of course, a newspaper ad is at best hearsay and therefore these ads must be shown to have been authorized by the subdivider of the property before they were admissible in evidence. Lindsey v. Commercial Discount Co., 12 Cal.App. 2d 345, 55 P.2d 896; 32 C.J.S. Evidence § 726. This was not done. We think it was error to admit the ads above mentioned but it was harmless error. Their admission was not necessary to show the plan by the subdivider that the well, equipment, water system and water rights were to become the property of the purchasers of lots in said subdivision as an appurtenance to the land. In fact, their probative value to show this was practically nil. The plan was adequately shown by evidence, independent of said ads, by the provisions of the deeds which made the land and water rights inseparable, and provided for the purchasers of said lots to ultimately own the well, equipment and water system.

■ The defendants next urge that the court erred in granting a permanent injunction to plaintiffs while motions to dismiss or modify the temporary restraining order

was pending. We are of the view that the ground assigned is without merit. Whether the court erred in granting the permanent injunction upon some ground other than that assigned is not before us. But certainly, after the court had consumed two days in the trial of the case wherein all the facts were presented, which could have any bearing upon a permanent injunction, it had the power to grant the parties full equitable relief to which it believed they were entitled. The mere fact that a motion to dismiss or modify the temporary restraining order was then pending could not possibly form the basis of an error. On the other hand, it constituted a ruling denying both motions.

The judgment is affirmed as to the validity of the clause quoted above relative to the well, equipment, water system, and water rights, and its binding effect upon the parties thereto, their heirs and assigns, and the case is remanded to the trial court for the purpose only of determining the amount to be paid to Kengla for water services rendered and improvements made by him upon the water system. With respect to the amount found to be due to Kengla from the lot owners, the court should provide in its judgment adequate means for its collection.

Judgment affirmed, with directions.

UDALL, C. J., and WINDES, STRUCKMEYER and LA PRADE, JJ., concurring.