**ADAMAN MUTUAL WATER COMPANY, a corporation, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 16583.**

United States Court of Appeals Ninth Circuit.
May 26, 1960.

Snell & Wilmer, Phoenix, Ariz., for appellant.

Perry W. Morton, Asst. Atty. Gen., Jack D. H. Hays, Phoenix, Ariz., for appellee.

Before BONE, POPE and HAMLIN, Circuit Judges.

BONE, Circuit Judge.

Appellant, Adaman Mutual Water Co., is the crux of a land utilization program of some complexity. In 1943 Goodyear Farms, a corporation, formed from lands which it owned in Maricopa County, Arizona, a Reclamation Project designed to demonstrate the feasibility of dividing large land holdings into traditional family sized farms. The area encompassed by this Project was exceedingly dry, and surface water for irrigation was unobtainable. Underground water had to be pumped and distributed, and to provide this service to the small farms envisioned in the Project, at minimum cost, appellant, a mutual, non-profit corporation, was organized.

Appellant's articles of incorporation prohibit anyone from holding company stock who neither owns land within the Project outright nor under agreement of sale. The owners of Project land, on

the other hand, may subscribe for that number of shares equal to the number of acres owned.[1] Each share of stock entitles its holder to a prorata share of water, and both water rights and stock are made appurtenant to the land upon which the water is to be used. In addition, the stock and the land to which it is appurtenant are subject to prorata assessments to be made from time to time by appellant to pay both for the capital investment in the irrigation facilities and for the operation and maintenance of the irrigation system. The assessments, once made, become a lien on the land and on the stock and water rights appurtenant thereto. If an assessment is not paid on time, appellant may foreclose upon the debtor's land and stock. No assessment can be made, however, upon stock appurtenant to land that has never been cultivated, that is, until cultivation begins.

The stock subscription agreement, which must be signed by each landowner receiving appellant's stock, stipulates that the stock and the right to receive water are to be forever inseparable from the land, that the transfer of the land automatically transfers the stock and the rights to water, and that the transfer of land without stock or stock without land is of no effect. If, however, it becomes impracticable to irrigate a segment of Project land the water rights appurtenant thereto may be severed from the land upon the owner's request. In addition, water rights may be forfeited by voluntary abandonment, by non-use for the term prescribed by law, or by failure of the owner of the land to which the rights are appurtenant to pay assessments levied by the company. By subscribing for stock, the landowner agrees to abide by the articles of incorporation, by-laws and regulations of appellant.

No provision is made for termination of the duty to pay assessments once the landowner accepts that burden by subscribing for appellant's stock and commencing to cultivate his land. The duty to pay assessments apparently is to continue even in the event that the right to water for the assessed land is forfeited. By not gearing the duty to pay assessments to the use of appellant's irrigation facilities, the backers of the Project avoided possible catastrophe. For if the duty to pay assessments were to terminate with the cessation of water use, the cost of irrigation to those continuing to work the land could become increasingly intolerable as their more easily discouraged neighbors discarded desert farming for some other occupation.

In 1953 the United States entered the picture by bringing condemnation proceedings against 233 acres or 8.3% of the land area within the Project. Most, but not all, of this segment had been transferred by Goodyear through warranty deed or agreement of sale. Only a small fraction of the condemned land was held under lease from the original owner. The compensation claims of those in possession have all been settled. In addition, appellant has been paid for ditches and other physical facilities located upon the condemned area of land.

The only question presently raised is whether or not appellant is entitled to be compensated for the loss of a portion of Project land since the remaining area will be subject to increased assessments in the future to pay for the maintenance, replacement and operation of the communal irrigation system, the cost of which has not been appreciably lessened by the condemnation. In other words, does the diminution of appellant's assessment base constitute the taking of a compensable interest under the Fifth Amendment?

█ We take as a point of departure what the Supreme Court said in United States v. General Motors Corp., 1945, 323 U.S. 373, at pages 377–380, 65 S.Ct. 357, at pages 359–360, 89 L.Ed. 311:

1. "Owners" and "landowners" will henceforth be used to designate parties who hold Project land either by deed or agreement of sale.

"The critical terms are 'property,' 'taken' and 'just compensation.' It is conceivable that the first was used in its vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. On the other hand, it may have been employed in a more accurate sense to denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. In point of fact, the construction given the phrase has been the latter. When the sovereign exercises the power of eminent domain it substitutes itself in relation to the physical thing in question in place of him who formerly bore the relation to that thing, which we denominate ownership. In other words, it deals with what lawyers term the individual's 'interest' in the thing in question. That interest may comprise the group of rights for which the shorthand term is 'a fee simple' or it may be the interest known as an 'estate or tenancy for years', as in the present instance. The constitutional provision is addressed to every sort of interest the citizen may possess.

"In its primary meaning, the term 'taken' would seem to signify something more than destruction, for it might well be claimed that one does not take what he destroys. But the construction of the phrase has not been so narrow. The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.

"But it is to be observed that whether the sovereign substitutes itself as occupant in place of the former owner, or destroys all his existing rights in the subject matter, the Fifth Amendment concerns itself solely with the 'property' i. e., with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership.

\*　　\*　　\*　　\*　　\*　　\*

"The sovereign ordinarily takes the fee. The rule in such a case is that compensation for that interest does not include future loss of profits, the expense of moving removable fixtures and personal property from the premises, the loss of good-will which inheres in the location of the land, or other like consequential losses which would ensue the sale of the property to someone other than the sovereign. No doubt all these elements would be considered by an owner in determining whether, and at what price, to sell. No doubt, therefore, if the owner is to be made whole for the loss consequent on the sovereign's seizure of his property, these elements should properly be considered. But the courts have generally held that they are not to be reckoned as part of the compensation for the fee taken by the Government. We are not to be taken as departing from the rule they have laid down, which we think sound. Even where state constitutions command that compensation be made for property 'taken or damaged' for public use, as many do, it has generally been held that that which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage." (Footnotes are omitted in the above quotation.)

Stated more succinctly, the Government must pay for all tangible interests actually condemned and for intangible interests directly connected with the physical substance of the thing taken. Comment,

18 U.Chi.L.Rev. 349 (1951).[2] The consequential loss rule, much maligned, ibid; Comment, 67 Yale L.J. 61 (1957); and somewhat dented, United States v. General Motors Corp., supra; Kimball Laundry Co. v. United States, 1949, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765, is with us still. It cannot be ignored.

■ When a parcel of land is condemned, the courts have tended to identify direct, compensable losses with interests includible in the bundle of rights which form conceptually the fee itself, rights which are said to be interests or estates in the land. See United States v. Welch, 1910, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787 (easement); Brooklyn Eastern District Terminal v. City of New York, 2 Cir., 1944, 139 F.2d 1007, 152 A.L.R. 296 (same); Creasy v. Stevens, D.C.W.D.Pa.1958, 160 F.Supp. 404, 411 (right of access); Tucker v. United States, D.C.D.R.I.1922, 283 F. 428 (profit a prendre). Since this distinction is apparently designed to accord some degree of predictability to the classification of remote and direct losses, it need not be applied as an unwavering principle. See Caltex (Philippines), Inc. v. United States, 1951, 100 F.Supp. 970, 974, 120 Ct.Cl. 518, reversed on other grounds, 1952, 344 U.S. 149, 73 S.Ct. 200, 97 L. Ed. 157. Nonetheless, if an interest in land is lost as a result of the taking of the parcel to which the interest attached, a direct connection with the physical substance condemned is established, and the pitfalls of the consequential loss doctrine are avoided.[3] Of course, even an interest in land may be non-compensable if it is so contingent as to defy evaluation. Peo-

ple of Puerto Rico v. United States, 1 Cir., 1942, 132 F.2d 220, 221–222.

■ We think that the duty to pay assessments in the instant case is an equitable servitude or restrictive covenant binding upon any once-cultivated segment of Project land serviced by appellant. Appellant has lost the benefit derived from this servitude, and the loss is compensable, for the Government has destroyed an intangible right directly connected with the physical substance of the land condemned.

■ The facts clearly show that Goodyear and those to whom Goodyear conveyed land intended to create an integrated, agricultural development. Both the warranty deed and the agreement of sale used by Goodyear reserved to it the rights in whatever water lay underneath Project land. The grantee or buyer could use the water under his parcel only for domestic purposes. Owners by deed held their segment subject to any liabilities or obligations imposed upon the land by reason of its inclusion within the boundaries of the water company, and those who entered into agreements of sale were bound to pay assessments levied by the water company on pain of foreclosure on their interests. These documents indicated that those who took from Goodyear were well aware of appellant's connection with the Project. In all probability a subscription for appellant's stock accompanied the execution of each deed or agreement of sale. In any event, the rights and duties imposed by the stock subscription agreement were apparently intended both to be incorporated by reference into the

2. As to intangible interests, such has not always been the case. See Cormack, Legal Concepts in Cases of Eminent Domain, 41 Yale L.J. 221 (1931).

3. In this regard, compare Omnia Commercial Co. v. United States, 1923, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773, in which the holder of a contract for steel plate was denied compensation upon the taking by the Government of the producer's entire output, with International Paper Co. v. United States, 1931, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410, in which

the holder of a landed interest in the use of water supplied by a power company was awarded compensation upon the Government's requisition of the Supplier's water. See also Southern Counties Gas Co. of California v. United States, Ct.Cl. 1958, 157 F.Supp. 934. The court there denied compensation for a loss of customers incurred when the United States condemned an entire community to which the appellant delivered gas. The claimant had established no interest or estate in the land taken.

uniformly used deed and agreement of sale and also to apply uniformly throughout the development for the benefit of each landowner by providing irrigation at the lowest possible cost. As an integral facet of the overall plan, the duty to pay assessments attached to all land to which stock was appurtenant and upon which cultivation had commenced. We think this burden constituted an equitable servitude enforcible under Arizona law. See Murphey v. Gray, 1958, 84 Ariz. 299, 327 P.2d 751; Kengla v. Stewart, 1957, 82 Ariz. 365, 313 P.2d 424; O'Malley v. Central Methodist Church, 1948, 67 Ariz. 245, 194 P.2d 444.[4]

■ That the duty to pay is an affirmative obligation rather than a negative restriction on use does not alter our conclusion. Although no Arizona decision is directly in point, the majority of American jurisdictions enforce with equal vigor affirmative and negative obligations that run with land. See cases collected in Notes, 41 A.L.R. 1363 (1926), 102 A.L.R. 781 (1936), 118 A.L.R. 982 (1939), and in Fitzstephens v. Watson, Or.1959, 344 P.2d 221, 232.[5]

The benefit derived from this servitude, in the form of lower irrigation costs, adheres to every acre of land within the Project to which stock is appurtenant. The benefit is encompassed by the water rights appurtenant to each parcel and runs with the land to the same extent as does the burden to pay assessments. Appellant must be viewed as claiming the loss of this benefit as the representative of its shareholders, not in their role as shareholders but as landowners in the Project. By recognizing this relationship, we neither ignore the corporate form, nor by "blind adherence to an ancient formula," hide from the realities of the situation. Neponsit Property Owners' Ass'n, Inc. v. Emigrant Industrial Savings Bank, 1938, 278 N.Y. 248, 15 N.E.2d 793, 798, 118 A.L.R. 973.

By calling appellant's claim an equitable servitude we conclude no issue, for the courts are split as to whether such a restriction is an interest in land for purposes of compensation when the property to which it attaches is taken for public use. The federal rule is uncertain; Arizona has not yet been faced with the issue.[6] Indeed, the distinction between rights in land and consequential losses has been blurred in restrictive covenant cases by policy considerations other than the need to draw a predictable line between direct and remote interests. The federal decisions mirror this difficulty. In United States v. Certain Lands in Town of Jamestown, C.C.D.R.I.1899, 112 F. 622, affirmed sub nom. Wharton v. United States, 1 Cir., 1907, 153 F. 876, the court held that a covenant restricting use had not been breached by the Government's utilization of the land. Going further, the court said:

4. The determination of the type of interest taken upon exercise of the federal power of eminent domain is governed by federal law, but will normally be made in accordance with local definitions. United State ex rel. Tennessee Valley Authority v. Powelson, 1943, 319 U.S. 266, 279, 63 S.Ct. 1047, 87 L.Ed. 1390; United States v. Causby, 1946, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L.Ed. 1206. However, state law which creates artificial interests or property rights non-existent elsewhere will be ignored. See State of Nebraska v. United States, 8 Cir., 1947, 164 F.2d 866, 868.

5. In enforcing affirmative obligations against subsequent holders of burdened land, courts have not distinguished between a purely equitable servitude, such as we have here, see Clark, Real Covenants 148 et seq. (1929) and other covenants which run with the land at law. Id. at 72 et seq. See Note 51 Harv.L.Rev. 320 (1937).

6. As to applicable law, see Note 4, supra. Arizona courts have adopted language similar to that used in United States v. General Motors Corp., supra, but have not yet specifically decided whether or not an equitable servitude is a property right entitled to compensation upon the exercise of the power of condemnation. See In re Forsstrom, 1934, 44 Ariz. 472, 479–480, 38 P.2d 878, 882; Maricopa County Municipal Water Conservation District No. 1 v. Warford, 1949, 69 Ariz. 1, 11, 206 P.2d 1168, 1174–1175.

"But it is said these claimants have a property right which is valuable, and which is appurtenant to their estates, namely, the right to enjoin all uses of the property inconsistent with these conditions. The difficulty seems to me to be in the contention that there can be any property right whatever, springing from private grant, that the lands of another shall not be used for necessary governmental purposes. Suppose a deed to contain the condition that the grantee's property should never be used by the United States for a fort, or by the state for a state capital [sic], armory, or school house; would not such a condition on its face be void, as against public policy? As each owner of land holds his property subject to the divesting of his title through the action of that state or of the United States, based on public necessity, can he by any means, directly or indirectly, impose upon the state or the United States the burden of compensating him for damage resulting from that public use which does not directly invade his land? If the lands on the southern end of Conanicut Island were held in fee by a number of owners, without restrictive conditions in their deeds, and the national government found it necessary to condemn any one of the estates, the adjoining owners, or those occupying other portions of the tract, could recover no damages whatever for the depreciation caused to their estates by the public use. Can it be possible that these owners, by mutual agreements or covenants that they or their successors in title will not do things which may be necessary for national defense, and by agreeing that these things are noxious and offensive to them, compel the United States to pay them for the right to do, upon lands taken, what is necessary for the protection of the nation?" 112 F. at page 628.

The appellate court affirmed on the strength of the finding that the covenant had not been violated, but indicated in addition that the interest involved was not a true interest in land. See 153 F. at page 876.[7] This notion that a restrictive covenant is not an interest in land and therefore non-compensable was relied upon in Moses v. Hazen, 1934, 63 App.D.C. 104, 69 F.2d 842, 98 A.L.R. 386. Two lines of thought emerge from these cases; one, that a restrictive covenant is not a property interest and therefore too remote to merit compensation when the land to which it attaches is condemned, and two, that a restrictive covenant is an impermissible means of enhancing one's own property and thereby burdening the power of eminent domain. Despite these decisions the court in a more recent federal case said:

"Whether the federal government, as distinguished perhaps from the State of New York, can brush aside the restrictive covenants concerning the character of buildings to be erected upon the condemned property, without making compensation to the remaining lot owners, is too serious an issue to be disposed of upon a mere motion to intervene. * * *

"The same remark applies to the matter of the increased financial burdens of maintenance resulting from the taking, which will necessarily rest upon the remaining owners." United States v. Certain Lands at Great Neck, D.C.E.D.N.Y. 1943, 49 F.Supp. 265, 267.

Citation was made to Peters v. Buckner, 1921, 288 Mo. 618, 232 S.W. 1024, 17 A.L.R. 543, in which a restrictive covenant was deemed a compensable property right.[8] In light of this conflict, we do

7. The remarks of both the trial and the appellate court concerning compensation for the loss of a restrictive covenant have been criticized as pure dicta. See Aigler, Measure of Compensation for Extinguishment of Easement by Condemnation, 1945 Wis.L.Rev. 5, 22; Note, 31 N.C.L.Rev. 125, 128 n. 10 (1952).

8. It should be noted that the Great Neck case involved a restrictive covenant which

not feel bound by precedent. Moreover, the state decisions afford little help. They are numerous, in hopeless conflict, and collected in 2 Nichols, Eminent Domain § 5.73.[9]

 Presently, a restrictive covenant is generally deemed a property right under federal law. Chapman v. Sheridan-Wyoming Coal Co., 1950, 338 U.S. 621, 70 S.Ct. 392, 94 L.Ed. 393. We think it should be treated similarly in an eminent domain context where the purpose of the distinction between property interests and other rights is to differentiate losses directly connected with the land taken from losses comparatively more remote. It follows from this that any right or duty, benefit or burden, which moves or is transferred as one with either the land or an estate in it must be deemed an interest in that land and compensable upon condemnation of the fee. Because the transfer of these rights and duties are subject to legal principles different from those which govern the passing of other interests, a unique, direct connection with the land is established. This connection justifies the distinction mentioned above. Accordingly, we think that under the Fifth Amendment a restrictive covenant imposing a duty which runs with the land taken constitutes a compensable interest.

The argument that an impermissible burden is put upon the power of eminent domain by a restrictive covenant is untenable. Why should a party receive compensation for an easement right which enhances the value of his property and yet be denied compensation for a right obtained by a restrictive covenant which similarly adds to the value of his

holdings? Both interests are directly connected to the land and we are unable to find a distinction between them which will justify dissimilar treatment at the hands of a condemning authority.

The case at bar is, of course, decisively unlike those cases in which the loss of the power to assess amounted to no more than a diminution of the statutory taxing power possessed by the instrumentality claiming the loss. When the right to assess cannot be distinguished from the taxing power, the interest lost is clearly non-compensable. To allow compensation would be to subject the United States to the taxing power of the several states, a result offensive to the Constitution since M'Culloch v. State of Maryland, 1819, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579. See Mullen Benevolent Corp. v. United States, 1933, 290 U.S. 89, 54 S.Ct. 38, 78 L.Ed. 192; Yoknapatawpha Drainage District No. 2, etc. v. United States, 5 Cir., 242 F.2d 925, 929, certiorari denied 1957, 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112; People of Puerto Rico on Behalf of Isabela Irrigation Service v. United States, 1 Cir., 134 F.2d 267, 271, certiorari denied 1943, 320 U.S. 753, 64 S.Ct. 59, 88 L.Ed. 448; United States v. 1,000 Acres of Land, D.C.E. D.La.1958, 162 F.Supp. 219, 223; Public Water Supply District No. 3 of Jackson County, Mo. v. United States, 1955, 135 F.Supp. 887, 890, 133 Ct.Cl. 348. In the instant case the right to assess does not lie with any governmental authority endowed by legislation with the power to tax. Accordingly, the award of compensation here would in no way impinge upon the basic principles of federalism at play in the cases cited above.[10]

imposed an affirmative obligation in the form of a duty to pay money.

9. Compare, for example, Town of Stamford v. Vuono, 1928, 108 Conn. 359, 143 A. 245, and Peters v. Buckner, 1921, 288 Mo. 618, 232 S.W. 1024, 17 A.L.R. 543, with Anderson v. Lynch, 1939, 188 Ga. 154, 3 S.E.2d 85, 122 A.L.R. 1456 and Sackett, v. Los Angeles City School District, 1931, 118 Cal.App. 254, 5 P.2d 23.

10. The instant case is in another way unlike Mullen Benevolent Corp. v. United States, 1933, 290 U.S. 89, 54 S.Ct. 38, 78 L.Ed. 192. The Supreme Court there held that a loss incurred by a holder of local improvement bonds to be paid off out of a fund created by assessing the landowners benefited by the improvements was non-compensable. The government had taken the land which was the subject of assessment. The bondholder himself had no right to assess; he had

The lower court found as facts that appellant had reserved only its right to claim compensation for the loss of 8.3% of the area within the Project; that this was the area taken by the Government; that appellant could not therefore make and collect any future assessments on this taken area, and that future assessments had not been made as of the date of the taking. We have no quarrel with the findings as to these facts, but for the reasons mentioned in this opinion we do not think that the lower court was warranted in concluding that appellant has lost no compensable interest.

In formulating this opinion we have indulged the assumption that the land condemned and taken by the Government had corporate stock appurtenant to it and had also been brought under cultivation. Such an assumption can be inferred both from the findings of fact and from the evidence in the record. Whatever may be the actual facts we think that specific findings of fact on these crucial points are desirable and should be made. This is because the stock subscription agreement itself created the aforesaid equitable servitude in favor of other stockholding landowners, and the duty to pay assessments would not arise until the land to which it attached had actually been brought under cultivation.

The judgment of the lower court is vacated, and the cause remanded for further proceedings not inconsistent with this opinion, including additional, specific findings of fact as to (1) whether or not water company shares were appurtenant to the acreage condemned by the Government, and (2) whether or not the land so taken by the United States had ever been brought under cultivation.

It is so ordered.

---

no right at all in the land taken. The power to assess inhered in the municipality which sold the bonds as an adjunct of the municipality's taxing authority. In the instant case the claimant itself possesses the assessing power which, since the claimant is a private corporation, is by no means related to the governmental power to tax.

On the other hand, we do not derive support from Columbia Irrigation District v. United States, 9 Cir., 1959, 268 F.2d 128; United States v. Florea, D.C.D.Or. 1945, 68 F.Supp. 367, or United States v. Aho, D.C.D.Or.1944, 68 F.Supp. 358. Those cases involved situations similar to the one before us except that the right to assess was legislatively granted. The claimant was a creature of statute; its assessments were akin to taxes. The cases cited above attempt to distinguish special assessments from taxes and to differentiate the power to tax in general from the special circumstances which surround public projects involving agricultural use of land. We need not rely upon that distinction.