**UNITED STATES v. AHO et al.**
Civil Action No. 1337.

District Court, D. Oregon.
May 15, 1944.

See also 51 F.Supp 137.

Bernard H. Ramsey, of Portland, Or., Stanley R. Darling, of Eugene, Or., James Leavy, of Pasco, Wash., and Bert C. Boylan, of Portland, Or., for the United States.

Russell E. Sewall, Russell W. Sewall, and C. W. Pecore, all of Portland, Or., for defendant Beaver Drainage Dis.

JAMES ALGER FEE, District Judge.

This is an action for condemnation of certain real property embraced within the limits of the Beaver Drainage District. The United States has specified in the amended complaint that the interest taken is the fee simple title. There are set out in the answer to the amended complaint, to which a demurrer has been filed, allegations regarding the function of the District and its operations which are claimed to show a compensable interest owned by the District in the parcel taken. An outline of such statements follows.

The defendant, Beaver Drainage District, is a quasi municipal corporation organized under the statutes of Oregon[1] and is thereby the repository of specified functions with relation to over five thousand acres of land. Within its boundaries under the law, there have been constructed many main drainage canals and these have been kept free from silt and debris in order to facilitate the proper drainage of the lands. For the same purpose, the principal sloughs and other natural drainage channels were to be improved. The costs in a sum of over $25,000 have been assessed against

[1] Title 123, Drainage and Diking Districts, Oregon Compiled Laws Annotated (1940).

the lands and have been "paid as taxes" by the owner.[2]

The system of drainage is constructed so that the waters from the lands, including the parcel taken by the United States, flow by gravity onto a parcel of land owned by the District,[3] where an electric pump of capacity of 48,500 gallons per minute pumps the waters drawn off these lands over the dike or levee along the boundary of the District into a tributary of the Clatskanie River. The water table under the lands, including the parcel here involved, is lowered and maintained at a level sufficiently below the surface of the ground to permit the use of the land for agricultural purposes. Without this process, the lands would be utterly valueless. The average cost of maintaining and operating the system of drainage by pumping out the excess is one dollar an acre each year. The surface waters from the lands within the boundaries including the condemned parcel, flowed both before and after acquisition by the government and will in the future continue to flow onto the land, and through this pumping plant, of the District.

To the answer of the Drainage District, a demurrer has been interposed and thus the whole problem is before us for disposal. The individual defendants have accepted the amount tendered as the value of the fee simple title. The District, however, contends that it has a compensable interest over and above the amounts so received by the fee owners, but that it claims no part of the money paid to the individual defendants. As heretofore pointed out, the government must pay for all the interests destroyed or acquired by condemnation or the judgment will not vest title thereto.[4]

The theory of the Lands Division is that the assessments from year to year are an exercise of the power of general taxation by a Drainage District as a municipal corporation and political subdivision of the State, and that the United States could not be liable for any assessments made after title to the land was acquired. The basis of this position lies in the fact that property of the United States is not liable to taxation by the State of Oregon.

Notwithstanding the allegations of the answer then, it is the position of the United States that in paying the fair market value of the fee simple title to the owners, it takes the property condemned free from any obligation to pay the future annual assessments levied by the Drainage District. If these annual assessments stand upon the same footing as unsecured levies of state, county and municipal taxes to liquidate general obligations of such bodies, the result contended for is correct. But it is claimed by the District, first, that there is a distinction between such general levies and local assessments by these bodies incorporated for special purposes and, second, that in the incorporation of such bodies, the State of Oregon has given a specific right or franchise to levy assessments covering costs which bind the real property in the hands of all takers.

It has been consistently recognized that the reclamation of swamp and overflowed lands is of utmost importance to the communities involved and is touched with the public interest.[5] In Oregon, districts are organized by the state in recognition of this public concern for the purpose of administering the law relating to drainage, diking or irrigation.[6] There has been a finding of direct benefit to each parcel of land in this Drainage District.[7] If the costs had exceeded the benefits to all the lands in the District, the plan would have been rejected and the District dissolved.[8]

Thus the plan originally adopted must

---

[2] §§ 123-122 and 123-144, Oregon Compiled Laws Annotated (1940).

[3] This is not directly stated in the answer but the fact is shown by the records.

[4] United States v. Bauman, D.C.Or., 56 F.Supp. 109.

[5] Hagar v. Board of Supervisors of Yolo County, 47 Cal. 222, 233. See as to irrigation: Twin Falls Land & Water Co. v. Twin Falls Canal Co., D.C., 7 F. Supp. 238, 246, 247.

[6] Twohy Bros. Co. v. Ochoco Irr. Dist., 108 Or. 1, 210 P. 873, 216 P. 189.

[7] §§ 123-116, 123-117, 123-118 and 123-121, O.C.L.A.

[8] § 123-104, O.C.L.A.

be one which will be economically feasible for the affected lands, because the crops raised on the various parcels must bring enough on the market to pay the current assessments. The debts incurred by the District in the construction of the works and continued operation thereof are not obligations of the State of Oregon. Nor are these obligations of the District in any strict sense. The only source of payment is the owners of lands within the boundaries thereof. The duty of the District which may be enforced only by mandamus, is to levy the assessments.

The history of drainage and irrigation districts in the past few years has shown that these cooperative structures for specific purpose are subject to special dangers. If the plan of reclamation was not feasible because sufficient income was not collected for maintenance, the District would be unable to function in its essential capacity. If a portion of the lands became unproductive, and unable to bear the weight of assessments and the District did not receive income therefrom, it was in grave difficulty. This was emphasized in the depression where many parcels did not raise profitable crops, and the payments of assessments went into arrears, and the District was required to levy higher assessments which fell upon the better lands whereby these likewise became unprofitable. The burden of delinquencies spread in geometrical proportion. By such disasters these entities created for the public purpose of reclaiming lands, were rendered helpless and after the passage of the municipal bankruptcy act, many of them sought refuge under its aegis.

If the United States condemns a certain proportion of these lands and thereafter refuses to pay the assessments, like results will follow in this District. If the United States had taken the parcels covered by the main drainage canals, and the parcel which contains the disposal pumps, and thus prevented the disposal of the waters, the District would likewise have ceased to function, but there compensation would be paid not only to the District for the physical properties taken, but also to the District as representative of the individual owners for the destroyed easements. Each parcel of land in this District has appurtenant to it an easement in the ditches, pumps and other works.

The Districts in question were organized under state authority and include a definite quantity of land. The limits and boundaries are fixed by necessity since only a specific area of land can usually be benefited by irrigation, drainage or diking with one series of works. Besides, parcels of land not benefited cannot be subjected to the burdens of contribution. The physical properties of water dictate the boundaries of a Drainage District. No less imperatively, economic feasibility dictates the size and cost of the works. The initial plan for development of these works is dependent upon these factors All this points to the conclusion that the United States should pay the annual assessment to prevent disaster in projects created for a public purpose. But it is conceded that liability can neither be predicated upon need alone, nor solely upon public policy.

The United States has, however, often paid compensation to a public corporation where easements or functions exercised for the benefit of the public at large, or those within the boundaries of the municipality, were used or carried on at increased cost or inconvenience by virtue of displacement, although strict property rights may not have been involved.[9]

The status of incumbrances upon the real property is to be determined by the laws of the particular state in which the land is located.[10] The statute of the State of Oregon relating to debts and obligations of Drainage Districts provides in part as follows:

"The board of supervisors shall each year make a computation of the whole amount of money to be raised by the district through assessments for the ensuing year for any and all purposes whatso-

[9] Wayne County v. United States, 53 Ct.Cl. 417; Town of Bedford v. United States, 1 Cir., 23 F.2d 453, 56 A.L.R. 360; United States v. Wheeler Township, 8 Cir., 66 F.2d 977.

[10] United States v. Certain Parcels of Land, 40 F.Supp. 436, 443.

ever in carrying out the provisions of this act, including maintenance and operation, estimated delinquencies on assessments; * * *." [11]

It is further specifically provided by law that:

"Such bonds and the interest thereon and all obligations for the payment of money authorized and incurred by such district shall be paid by the revenue derived from the annual assessments upon the land and other real property within the district, and all the lands and other real property within the district shall be and remain liable to be assessed for such payments as herein provided and under and subject to the provisions of this act." [12]

These various practical considerations point to the theory that the State of Oregon was simply lending the machinery for tax collection to enforce the inherent duty raised by the situation of the particular parcel itself. We shall now consider the question of whether this process falls within the principle of levying a tax by an instrumentality of the state against property of the United States.

The common law basis for the apportionment of the cost of works to protect an area from overflow of the sea or a river is disclosed in Keighley's Case, 10 Coke Rep. 139a. There it is indicated that when a sea wall is overthrown by a sudden and unusual increase of water, there was a duty of everyone who was in a position to sustain damage or loss to assist in repair or reerection. A statute of Henry VIII is construed to mean that under such circumstances the Commissioners of Sewers shall tax all such persons "according to the quantity of their lands" to replace the wall. When Bristol Channel violently broke through a neck of land on the western side of the river Perrot, and thereafter violently broke the sea wall on the western side, the validity of an order of the Commissioners of Sewers directing a new sea wall to be constructed of 486 yards in length in Huntspill parish and ordering a rate to be made on all persons occupying or interested in the lands throughout the level that had been affected by innundation or that might be prejudiced by want of a sufficient sea wall, was impliedly sustained in Rex v. Commissioners of Sewers for Somerset, (1799) 8 T.R. 312. In a case involving a sea wall upon Curry Marsh farm on the Essex shore of the Thames, these principles were affirmed with a reference to the more modern statutes. 3 and 4 Will. IV, c. 22, s.s. 8, 11, 13, 14, 17, 46 and 24, and 25 Vict., c. 133, s. 47. This report is Commissioners of Sewers for Fobbing v. Regina, 11 App.Cas. 449.

This use of the noun "tax" and the verb "to tax" is carried on through such statutes and reappears in the current legislation of Oregon dealing with these districts.

There is, of course, a well recognized distinction between taxation and the levy of assessment for a special benefit. This distinction becomes very broad when a group of lands in a peculiar situation is amalgamated by the power of a state for the purpose of apportioning the indebtedness arising from the construction of vital protective works and the cost of perpetual maintenance. The use of the sovereign power to compel this banding together of the landowners in a certain area is required because otherwise a recalcitrant landowner situated upon key property would be able to block irrigation and drainage of areas of land utterly waste in the natural state, but of great fertility when so improved. The fiscal experience of such entities shows that the plans for payment of the indebtedness and upkeep is so closely figured that when a very small proportion of the included lands no longer pays the assessment, the project becomes unfeasible. The pressure for the passage of the municipal bankruptcy act was caused largely by the failure of such districts once a small proportion of the lands could no longer be profitably cultivated in the depression era.

In a note in 90 A.L.R. 1137, 1138, it is said:

"In a broad sense, special assessments are taxes, and the right to impose assessments has its foundation in the taxing power of the government; and yet in practice, and as generally understood, there

---

[11] § 123-122, O.C.L.A.
68 F.SUPP.—23½

[12] § 123-144, O.C.L.A.

is a broad distinction between the two terms. Taxes, as the term is generally used, are public burdens imposed generally on the inhabitants of the whole state, or some civil division thereof, for governmental purposes, without reference to peculiar benefits to particular individuals or property. Assessments have reference to impositions for improvements which are specially beneficial to particular individuals or property and which are proposed in proportion to the particular benefits supposed to be conferred. They are justified only because the improvements confer special benefits, and are just only when they are divided in proportion to such benefits."

■ Likewise, the same authority points out that an exemption from taxation does not give immunity from assessments levied by such districts. It is said:

"It is a general rule, to which there are but few exceptions, that a constitutional or statutory exemption from taxation is to be taken as an exemption from ordinary taxes only, and does not include special assessments for local improvements."

The cases noted there support the text.

The Supreme Court of the State of Oregon has preserved this distinction in construction of the statutes relating to the priorities to be given general taxes, the assessments levied by these districts and the lien of a mortgage to the State in a sovereign capacity. In State Land Board v. Davidson et al., 147 Or. 504, 507, 34 P.2d 608, 609, speaking of an irrigation district, it is said:

"In the instant case, the bonds and other obligations of respondent being prior in time to the mortgage of the State Land Board, different principles apply. * * * the assessments are for the payment of prior bonds outstanding and *maintenance* of the project, and the question of general taxes for the maintenance of the state, counties, and schools is not involved and we do not pass upon that proposition." [13]

The same distinction is made specifically as to Drainage Districts by an expression in the recent case of State ex rel. Kiesel's Estate v. Bishop et al., 167 Or. 448, 459, 127 P.2d 736, 740, 129 P.2d 276:

"In legal contemplation the assessment is against the benefits conferred by the improvement, and the annual sums payable are not taxes in the ordinary meaning of that term; but in this case those details are of no consequence. Although the tax is levied by the board of supervisors, which also determines the amount of the annual installments, payment is made at the same time as all other taxes are paid and to the same county officials."

■ In view of the doctrine thus laid down it may be said that the levy of assessments by a Drainage District in the State of Oregon is not the exercise of the power of general taxation. Although denominated a tax in accordance with the ancient precedent, it is in fact an apportionment of costs of construction, operation and maintenance of works to parcels of land continuously benefited thereby.

This decision sufficiently establishes the proposition that this "tax" can be levied by a Drainage District upon real property which has come into possession of the United States. This legislation was intended to prevent the appropriation of the security for the bond issues which made the project feasible and, for the charges for operation and maintenance which enable it to carry on its function, by the sovereign, state or nation even though the compensation for the services rendered takes the form of "taxation."

There are three cases upon which reliance is placed which do not militate against this position.

The first is Mullen Benevolent Corp. **v.** United States, 290 U.S. 89, 94, 54 S.Ct. 38, 78 L.Ed. 192. The United States condemned certain lots in a city. Subsequently an action was brought under the Tucker Act, 24 Stat. 505, to recover from the United States a balance due on improvement district bonds issued by American Falls for sidewalk and sewer construction. These bonds were not liens on the land. The court held that a reassessment of the amount of deficiency after the United States had condemned, served no purpose. The court there held that assessments of a local district, an adjunct of an incorpo-

---

[13] Emphasis supplied.

rated city, for the improvement of streets, were taxes and that the government was not liable for levies in futuro although those which were already liens must be paid. This result followed whether the United States took by deed or condemnation. There was, of course, no showing that the United States would be benefited by the improvements for which the assessments were made which was not reflected in the market price of the condemned parcels. Nor was there any contention that the lands were made liable for the future levies and assessments by the ordinance of the city of American Falls. Indeed, it would not be possible for a municipality to affect the real property law of the State of Idaho.

A differentiation may be pointed out between a local improvement district for the purpose of improving streets in an existing municipality, and the situation here. The easements for the streets are there already in existence and the expense of improvement thereof is the only matter sought to be imposed. In the Drainage Districts, definite common law easements are created. These become appurtenances of the particular parcels of land.

The right of the state legislature to include government lands in an irrigation project and subject them to assessment, is doubtful as is said in argument by the court in San Diego v. Linda Vista Irrigation District, 108 Cal. 189, 41 P. 291, 35 L.R.A. 33. No such problem is involved in the instant case. In a federal case, the dictum above noted was accepted without discussion of the pertinent factors. United States v. Anderson Cottonwood Irrigation District, D.C., 19 F.Supp. 740 (Judge Louderback). The problem of whether the legislature could subject lands owned by the federal government to inclusion in an irrigation district is confused with the question of whether the United States acquiring land within the boundaries of a regularly organized District could be required to pay assessments. The court did not state whether the land acquired by the United States had any water right appurtenant thereto. Nor is it shown that

the parcel had any benefit by inclusion in the Irrigation District. The court did not state whether the District was required to render services in connection with the land so acquired. There was no discussion of the question of whether there were appurtenant easements connected with the land acquired which passed to the United States.

In People of Puerto Rico v. United States, 1 Cir., 134 F.2d 267, 269, there was originally a statutory "right to use the water inalienably appurtenant to the land in the irrigation district." This right was suspended by subsequent legislation which imposed a special tax annually on each acre in the District to make payment on bonds issued for construction and ratified the sale of the water to other lands. Neither the parcels of land taken nor the United States received any benefit which was not reflected in the market price of the condemned lands. There was thus no property right appurtenant to the land taken by the United States. Puerto Rico had accepted payment for the tangible assets such as ditches, pipe lines and the shifting of the water on other lands. It was held that there was no lien. It was finally said:

"The People of Puerto Rico could have provided that the amounts required to pay the principal and interest on the bonds and the cost of maintaining and operating the irrigation system should constitute a lien in its favor upon the property but this was not done."

The court held since there was no lien, and no property interest involved, that the right to levy special assessments to pay bonds, where no corresponding benefits were conferred, was an exercise of the power of general taxation and lands owned by the United States were not bound thereby. In this, then, the case of Mullen Benevolent Corporation v. United States, supra, was followed.

Although here the state statutes imposed neither upon the parcel taken by the government or any other parcel, a lien in the form of an ascertainable amount due, it was the intention to impose an obliga-

tion[14] to pay the future assessments for maintenance and operation of the dikes, ditches and power pumps. This obligation is an encumbrance [15] in the sense that it is a "right to or interest in the land which may subsist in third persons to the diminution of the value of the land but consistent with the passing of the fee." Rawle, Cov. § 75, 5th Ed.

Analogies which indicate there is reasonable basis for the creation of such an obligation in relation to land may be readily called to mind. Powers in relation to realty, the placing of a charge upon land, the imposition of a covenant to pay taxes, are examples of obligations which might parallel these. In an extremely interesting case, the New York courts enforced a covenant running with the land for payment of an annual charge in the future for improvements on residential tracts then being developed by a realty company, and providing such charge should create a lien. The defendant who purchased the parcel of land at judicial sale was held liable for such assessments. The case does not show whether the lien enforced was for assessments in arrears and charged against the land before or after his purchase. Neponsit Property Owners' Ass'n, Inc., v. Emigrant Industrial Savings Bank, 278 N.Y. 248, 15 N.E.2d 793, 118 A.L.R. 973.

But in Oregon these obligations are not created by private contract or stipulation, but are incidents by law. The law has been established by the legislature and by the highest court of the state. The encumbrance should be of at least as great validity as a like burden imposed by the parties by covenant. The government, when it acquires land by condemnation in a state, does not acquire rights of sovereignty, nor the right to establish incidents of real property. The United States acquires in this type of situation, exactly the same interest as does a private individual[16] except for the fact that the land is not subject to general taxation by the state. If it be said that a lien to be made definite by future computation is not ordinarily an incident of real property, such a position can be refuted by the fact that the imposition of an incident of this sort was within the competence of the Oregon legislature and in fact, it actually was imposed[17] as an encumbrance upon all the lands within the boundaries of the District.

As noted above, the statutes of the State expressly provide that all lands in the District shall be and remain liable to be assessed, among other things, for costs of operation and maintenance.[18] It was intended that this section should create a paramount obligation upon all lands included in the boundaries for all such payments. There is no provision for the release of any parcel from such encumbrance. Only after all the bonds and costs have been paid can a District be dissolved.[19] The legislature has also provided that if the State of Oregon owns lands in a District of this kind, such lands are subject to assessment in the same manner and to the same extent as if held by private individuals. This provision reads:

"Any land, the title to which is now or may hereafter be vested in the state, or state lands sold under contract in any drainage district, shall be subject to taxation by the district, and the full amount of assessment due against said lands shall be paid to the district at the same times and in the same manner as other drainage district assessments are paid; * * *."[20] This is the expression of an intent to impose an obligation from the time of the organization until the District ceased to perform its beneficial function.

In State Land Board v. Davidson et al., supra, the problem of the nature of the

[14] The question whether this obligation is a property interest is not discussed here. For an exposition of this subject see United States v. Florea, 68 F. Supp. 367.

[15] See Harrison v. Des Moines & Ft. D. R. Co., 91 Iowa 114, 58 N.W. 1081; Batley v. Foerderer, 162 Pa. 460, 29 A. 868.

[16] See Guild v. Wallis, 130 Or. 148, 157, 279 P. 546.

[17] Noble v. Yancey, 116 Or. 356, 241 P. 335, 42 A.L.R. 1178; Kollock v. Barnard, 116 Or. 694, 242 P. 847. See also Johnson v. Warm Springs Irrigation District, 118 Or. 239, 246 P. 527.

[18] See note 12.

[19] O.C.L.A. § 123-145.

[20] § 123-122, O.C.L.A.

obligation imposed by similar statutes upon land in an irrigation district was before the court. There the East Fork Irrigation District was organized in the year 1913, and in 1916 issued its bonds. In 1918 the State Land Board took a mortgage upon the particular farm involved within the boundaries of said district. This mortgage was renewed in 1928. In 1932 the State Land Board brought suit to foreclose. Before the institution of the suit, the district had levied against the mortgaged real property annual assessments for maintenance and payment of the bonded indebtedness in the years 1928 to 1931 inclusive. It was held that the assessments took priority over the mortgage. The court say:

"The law under which this irrigation district was organized made no provision for segregating bonds issued by an irrigation district into units so as to cover a particular tract of land in the proportion that said tract bears to the whole tract covered by the bond issue. It is only when the assessments for the necessary annual service is made that that is done. Yet the law does provide that 'all the land in the district shall be and remain liable to be assessed for such payments'. Oregon Code 1930, § 48-504.

" 'Could any court reasonably hold that under our irrigation district law, or any law, in principle the same, all the land in the district would not be liable to be assessed for the payment of the principal and interest of the bonds and other obligations of the district? As to the bonds such payment is an obligation nominated in the bonds, and all of the land of the district would be liable therefor.' Noble v. Yancey, 116 Or. 356, 241 P. 335, 338, 42 A.L.R. 1178.

\* \* \* \* \* \*

"The bonds of respondent, at the time of their issuance as well as the other obligations assumed by the district at the time of its organization, were secured by all the land in the district. The state land board, by loaning money to the owner of land pledged for the payment of the bonds and support of the other obligations of the district, cannot through that process take such land out from under its just obligations and thus transfer these burdens to the other landowners in the irrigation district.

\* \* \* \* \* \*

"This legislation is intended to protect the man who loans money to put water on the land within an irrigation district from appropriation of his security thereafter by the state.

"It is common knowledge that land lying within this particular irrigation district, in the semiarid portion of the state, is of little or no value without irrigation. If the state has acquired lands within the district, that had been pledged for the payment of bonds and maintenance prior to their acquisition by the state, is there anything wrong in compelling the state to contribute its just share to that obligation? No one would contend that the state could compel the irrigation district, without just compensation, to furnish water service to the state lands. 'Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation. \* \* \*' Article 1, § 18, Constitution of Oregon. This section applies with the same force to corporations and groups of persons as to individuals."

The United States is here taking the fee title. The market value has been fixed subject to the encumbrance since all private owners must pay the assessments. But the United States advances the claim that it takes free from the encumbrances. If it takes free from the encumbrance, property of the District, as representative of the property owners, has been destroyed and must be compensated for. If the United States takes subject to the encumbrance, the assessments must be paid by the government as long as it holds the parcel.

As soon as the United States acquires the rights to this parcel of land it will obtain the benefits of the works, system of ditches and pumping plants maintained under statutory provisions by the District.[21] The waters which fall upon this

[21] There has been a finding of benefit to each parcel upon which an assessment is laid. §§ 123-104, 123-116, 123-117, 123-118, 123-121. See Re Harper Irri-

particular parcel will continue to be drained off by these facilities. If the system no longer operates, the lands will become waterlogged and valueless for any purpose. These benefits are concomitants of easements appurtenant to the particular parcel.

There is early authority that if the United States condemned the real property upon which the District depended for its essential function, and by virtue of which it held the franchise of collecting charges for the vital service it was rendering, it must make compensation therefor.[22] In the Monongahela case, the United States appropriated real property including a lock and a dam erected at the invitation of the United States and to which was inherently connected a franchise from the State of Pennsylvania to take tolls for passing through the lock. The element of estoppel played a part in this decision.[23] But it will be noted that here the United States has appropriated a parcel of real property connected with a Drainage system erected at a great cost out of which the lands taken by the government receive benefits vital to their value as useful property. If the United States does not pay, the Drainage District may lose its effectiveness in the public service. The lands are bound for the assessments in private hands. Under such circumstances, the United States has actively appropriated a portion of the "enterprise for public purposes"[24] and an estoppel to deny the necessity for compensation is thus set up.

■ The law of Oregon, by statute and decision, has created an encumbrance on lands in the Drainage District which holds the land itself for future assessments. Even if the right exercised is that of taxation, the statutes of the state under which the District was created specifically place the land under the charges to be made from year to year. The charges imposed upon lands included in one of these Districts are established by the legislative authority of the State of Oregon and are binding upon private individuals, the state itself[25] and all who take proprietorship of such land. The United States now claims to take the property presently benefited, as it is by the improvement, but without accepting the burden of the taxes specifically imposed by legislation to pay for the benefit. If so, the land is really taken out of the District. The District is deprived of the right granted by the legislature of Oregon to levy assessments or take toll from this particular parcel for the service rendered. The United States should be estopped from taking the benefit and preventing the exercise of the franchise as to this parcel.[26] It may be appropriately inquired whether the United States can transfer the land to private ownership benefited as it is, but immunized from the burden. The answer of the District sets up all these elements and the attack thereon must fail. At the trial the jury should be permitted to fix the value of the lands benefited, free from the burden of future assessments so that the taking will not be without just compensation. On the other hand, if the United States is accepting the title subject to future assessments, that should then be made clear.

The demurrer to the answer is overruled.

---

gation District, 108 Or. 598, 617, 216 P. 1020; Smith v. Hurlburt, 108 Or. 690, 708, 709, 217 P. 1093.

[22] Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463.

[23] United States v. Powelson, 319 U.S. 266, 281, n. 12, 63 S.Ct. 1047, 87 L.Ed. 1390.

[24] The question of whether there is a property right is dealt with elsewhere. United States v. Florea, 68 F.Supp. 367.

[25] Umatilla County v. Bowman, 155 Or. 49, 62 P.2d 266.

[26] This theory best explains compensation in a case where the political subdivision has no property right in the land taken. See Jefferson County, Tenn., v. Tennessee Valley Authority, 6 Cir., 146 F.2d 564. See also cases cited in Note 9, supra. The governmental unit usually has no proprietary right in roads and streets but has the function of construction, maintenance and protection for use of the public.