The PEOPLE OF the STATE OF CALI-
FORNIA, acting BY AND THROUGH
the DEPARTMENT OF PUBLIC
WORKS, Plaintiff,

v.

25.09 ACRES OF LANDS, MORE OR
LESS, et al., Defendants.

Civ. No. 68-118-J.

United States District Court,
S. D. California.

March 26, 1971.

Rypinski, Hollingsworth, Peterson & Endeman, San Diego, Cal., for plaintiff.

Harry D. Steward, U. S. Atty., and Raymond F. Zvetina and Keith E. Mc-Williams, Asst. U. S. Attys., San Diego, Cal., for the United States.

### ORDER AND MEMORANDUM OPINION

*JAMESON*, Senior District Judge.

The State of California has condemned lands for highway purposes, including 25.09 acres on the Fort Yuma Indian Reservation, located in Imperial County, California. The land was allotted in severalty to six named defendants and is held in trust by the defendant United States. The land is subject to assessment for water services from facilities of the Yuma Project, a federal reclamation project. The United States claims a compensable interest by reason of its right to assess an annual operation and maintenance charge against all irrigable lands entitled to water service from this project. An interlocutory judgment has been entered granting awards to the owners and parties in interest, except for this claim of the United States.

On December 4, 1970 a pretrial order was entered, which recites that no issues of fact remain for determination and that the "following issues of law, and no others, remain to be litigated upon the trial:

"A. Whether or not diminution of assessment base for annual operation and maintenance charges · of irrigation facilities owned by defendant UNITED STATES OF AMERICA is compensable.

"B. If said interest is compensable, whether or not such compensation is included in the fair market value of the land acquired or whether it is in addition to the fair market value.

"The UNITED STATES OF AMERICA alleges that it has a compensable interest in the subject property in addition to the fair market value thereof, by virtue of its right under Federal law to assess and collect an annual operation and maintenance charge against all irrigable lands entitled to water service from the facilities of the Yuma Project, a Federal Reclamation Project. The subject lands are irrigable lands located within the Reservation Division of the Yuma Project and are entitled to water service from the Project works. Annual operation and maintenance charges for the operation and maintenance of the Project irrigation system are assessed by the Bureau of Reclamation against all irrigable lands within the Reservation Division including the subject lands on a per acre basis, which charges, if not paid, become a lien upon the land. The said operation and maintenance charges are an affirmative obligation running with the land.

"The removal of said lands from the service area of the Project by condemnation for highway purposes will not decrease the overall cost of operating and maintaining the irrigation system, but will remove a portion of the assessment base, thereby depriving the UNITED STATES of a beneficial interest in said land and increasing the annual operation and maintenance charges assessed against the remaining owners of irrigable land within the Division. Their beneficial interest is a valuable property right separate and apart from and in addition to the ownership of the landowners of the property in question. The fair market values referred to in the Interlocutory Judgment in Condemnation to be filed herein relate to the landowners' interest and do not reflect in any manner the value of the interest of the UNITED STATES.

"Plaintiff asserts that said charges are not compensable. Plaintiff further asserts that even if said charges were held to be compensable they are necessarily included in the fair market value of the land acquired."

Supplementing the formal pretrial order, a memorandum of the United States sets forth the statutory background for the allotment of irrigable lands within the Fort Yuma Indian Reservation and for the development of land in the reservation through irrigation. The memorandum describes in more detail the construction of the Yuma project and the assessments for construction costs and current operation and maintenance charges. In particular, operation and maintenance charges against the Indian lands are made "by the Bureau of Reclamation on the basis of the irrigable acreages involved in the allotments. These assessments are totaled and are paid to the Bureau of Reclamation by the Bureau of Indian Affairs on an annual basis through a transfer of funds."

The memorandum continues in part:

"The Bureau of Indian Affairs in turn funds Reclamation's assessments by collections from lessees of leased Indian lands, Indian allottees if they can pay, and also by Congressional appropriations where the Indian cannot pay or other considerations are involved. The majority of Indian lands are presently leased to non-Indians. Under paragraph 3 of the Standard Lease Agreement, it is provided that the lessee is obligated to pay operation and maintenance assessments annually in advance of due date preceding each irrigation season. The subject lands are included under such lease arrangements.

" *  *  *

"The current assessments for operation and maintenance charges are a lien on the Indian lands. The liens for operation and maintenance charges are established by the provisions of 25 CFR 129.1. This regulation was issued pursuant to the Act of August 1, 1914, 38 Stat. 583, 25 U.S.C. 385. *  *  * See also the Act of March 7, 1928, 45 Stat. 210, 25 U.S.C. 387."

The contentions of the United States under this state of facts are summarized as follows:

"The issue in this case, as we see it, is whether the United States can be compensated for future operation and maintenance charges which would otherwise be assessed against the irrigable lands taken for highway purposes. If these are not paid by the State, then a larger burden is placed on the remaining lands of both Indian and non-Indian in the form of increased operation and maintenance charges. We are informed by the Bureau of Reclamation that there are no additional lands in the Division on which such charges may be levied. The operation and maintenance costs will not be lessened in the future by the acquisition of the lands by the State of California and the construction of its highway. Further, the Federal government as trustee of the Indian lands involved has statutory duties to provide irrigation service to the Indian allottees and their lands, and to recoup the cost or a part of the costs expended therefor by assessments on the lands within the Division except where they may be waived or cancelled by the Congress. We know of no statutory waivers of the liens for operation and maintenance charges within the Division. The Government or the Indians should not have to suffer a loss in this regard where lands are taken out of irrigable status to serve purposes other than agriculture."

Plaintiff is "in substantial agreement" with defendant's statement of facts, but points out that "the United States of America is not the landowner in the traditional sense. The true landowners are the individual allottees who have been fully compensated pursuant to the interlocutory judgment."

Neither party has cited nor has the court found any case precisely in point. Defendant United States relies primarily on Adaman Mutual Water Company v. United States, 9 Cir. 1960, 278 F.2d 842. In that case land in an agricultural development project was supplied with irrigation water by a nonprofit water company. The Government condemned 8.3 per cent of the land within the project. The court held that the duty to pay assessments was "an equitable servitude or restrictive covenant binding upon any once-cultivated segment of Project land serviced" by the water company;[1] that the company "has lost the benefit derived from this servitude, and the loss is compensable, for the Government has destroyed an intangible right directly connected with the physical substance of the land condemned"; and that the diminution of the water company's assessment base accordingly constituted the taking of a compensable interest under the Fifth Amendment.

Plaintiff contends that the instant case is "directly opposite to the situation" in Adaman for two reasons: (1) Adaman "was dealing with compensability of an equitable servitude under Arizona law", while in California "equitable servitudes are not compensable in eminent domain proceedings"; and (2) "In *Adaman*, the court was dealing with a private water company who did not have the power to tax", whereas in this case, "the Federal Government does have the power to tax."

Defendant in turn argues that the law of California is in no way inconsistent with the holding in Adaman, and that the term "taxation" does not include "assessments" for irrigation districts and similar improvements.

[1]. In Adaman the water company had been paid for ditches and other physical facilities located upon the condemned land. Here the construction costs were paid through receipts from sale of irrigable lands or cancelled under the provisions of the Act of July 1, 1932 (47 Stat. 564, 25 U.S.C. § 386a), commonly known as the Leavitt Act. Accordingly both Adaman and the instant case involve the question of compensability for future assessments for operation and maintenance charges.

Before proceeding with the contentions of the parties it should be noted that the irrigation project was created under federal and not state law. The lands taken are located on an Indian Reservation. The defendant United States has a lien under federal law for the operation and maintenance charges, which the parties recognize in the pretrial order as an "affirmative obligation running with the land." In addition, there are no other lands which may be added to the project, and the operation and maintenance charges will not be lessened by reason of the taking. Accordingly the burden of either the United States or the Indian landowners will be increased if no compensation is allowed.

Both parties recognize that the determination of this case depends upon whether Adaman is applicable. In holding that the duty to pay assessments was an equitable servitude and the resulting loss to the water company was compensable, the court said in Adaman:

"We think that the duty to pay assessments in the instant case is an equitable servitude or restrictive covenant binding upon any once-cultivated segment of Project land serviced by appellant. Appellant has lost the benefit derived from this servitude, and the loss is compensable, for the Government has destroyed an intangible right directly connected with the physical substance of the land condemned. 278 F.2d at 846.

" * * *

"By calling appellant's claim an equitable servitude we conclude no issue, for the courts are split as to whether such a restriction is an interest in land for purposes of compensation when the property to which it attaches is taken for public use. The federal rule is uncertain; Arizona has not yet been faced with the issue. Indeed, the distinction between rights in land and consequential losses has been blurred in restrictive covenant cases by policy consideration other than the need to draw a predictable line between direct and remote inter-

ests. The federal decisions mirror this difficulty." 278 F.2d at 847.

After reviewing conflicting federal cases, the court continued:

" * * * In light of this conflict, we do not feel bound by precedent. Moreover, the state decisions afford little help. They are numerous, in hopeless conflict, and collected in 2 Nichols, Eminent Domain § 5.73.

"Presently, a restrictive covenant is generally deemed a property right under federal law. Chapman v. Sheridan-Wyoming Coal Co., 1950, 338 U.S. 621, 70 S.Ct. 392, 94 L.Ed. 393. We think it should be treated similarly in an eminent domain context where the purpose of the distinction between property interests and other rights is to differentiate losses directly connected with the land taken from losses comparatively more remote. It follows from this that any right or duty, benefit or burden, which moves or is transferred as one with either the land or an estate in it must be deemed an interest in that land and compensable upon condemnation of the fee. Because the transfer of these rights and duties are subject to legal principles different from those which govern the passing of other interests, a unique, direct connection with the land is established. This connection justifies the distinction mentioned above. Accordingly, we think that under the Fifth Amendment a restrictive covenant imposing a duty which runs with the land taken constitutes a compensable interest." 278 F.2d at 848-849.

The two state court cases most nearly in point factually reach opposite conclusions. Each may be distinguished, however, by reason of state statutes. In State v. Human Relations Research Foundation, 1964, 64 Wash.2d 262, 391 P.2d 513, upon which defendant relies, the Supreme Court of Washington held that in an action by the state to condemn for highway purposes irrigable land within a reclamation district, the district had a compensable interest in the lands

taken and that the statute requiring that payment be made to the district was constitutional. The statute expressly provided for the payment of the land's pro rata share of bonded and contract indebtedness of the district. After quoting from Adaman, supra, the court said in part:

"* * * The fact that the right to levy assessments in the instant case is lodged in a semi-public body makes no difference; the statute simply lends the machinery for tax collection to enforce the inherent duty impressed upon the land by the equitable servitudes and restrictive covenants necessary to accomplish the purposes for which the district was formed. The district is being deprived by condemnation of the right to collect the pro rata share of construction, operation and maintenance costs against the land involved. It is the deprivation of this right, rather than the accretion of any right to the state, that constitutes the taking.

"We conclude, as did the trial court, that the district is being deprived of

'* * * a compensable property right for which the respondent district is entitled to compensation under the provisions of Amendment 9 of the Washington State Constitution.'" 391 P.2d at 516.

In Helena Valley Irr. Dist. v. State Highway Com'n, 1967, 150 Mont. 192, 433 P.2d 791, upon which plaintiff relies, the Supreme Court of Montana held that an irrigation district was not entitled to recover compensation of the State Highway Commission for future assessments or operations and maintenance. It took the position that the irrigation district was simply providing "goods and services" to lands of another and that when the lands were no longer irrigable, the services were not required. The court held that there was no constitutional right to receive assessments and the

right to recover them accordingly depended upon the state's statutes. The Montana statutes specifically provide that when the highway commission acquires irrigable land for highway purposes it "shall pay to the owner of the irrigation or drainage project, in addition to other sums allowed by law, a proportionate share of the unpaid construction costs of the project or drainage district." The court held that the legislature "having specifically mentioned construction costs and not having mentioned the corollary costs of operation and maintenance, the latter is not to be paid by the Highway Commission." 433 P.2d at 793, 794.

The Montana Court noted that the Washington statute required the payment of operation and maintenance expenses and that this was the basis for the decision in State of Washington v. Human Relations Research Foundation, supra. The court continued: "We cannot agree with the Washington Court to the extent, if any, that they relied on the theory of an unconstitutional taking to arrive at their decision rather than on their state statutes." Id. at 793.

As pointed out in Adaman, the state cases are in hopeless conflict on the question of whether compensation may be allowed for an equitable servitude. Most of the reported cases, however, have involved equitable servitudes in the nature of restrictive covenants in deeds, generally known as "building restrictions", which Nichols on Eminent Domain aptly describes as a "rather perplexing situation." The majority view, according to Nichols, holds that such a restriction "constitutes property in the constitutional sense and must be compensated for if taken. * * * The owners of such property cannot maintain proceedings for damages against the original owner or enforce the restrictions against the condemnor, but they are entitled to an award of compensation for the destruction of their easements."[2] In

2. For a good discussion of the majority rule see United States v. Certain Land in the City of Augusta, Maine, D.Maine 1963,

220 F.Supp. 696, 700, where the court recognized that the "state decisions are in hopeless and irreconcilable conflict"

a footnote Nichols quotes extensively from Adaman in support of the majority rule.[3] 2 Nichols on Eminent Domain, 3 Ed. 1970, § 5.73 [1] at p. 5–178, n. 7.

On the other hand, according to Nichols, it is the minority view that "negative easements belonging to other owners" may be taken without payment of compensation. "It has been argued that such restrictions were not intended to apply as against public improvements. It has also been suggested that, since all property is held subject to the power of eminent domain, the rights of the condemnor are impliedly excepted from operation of the restricted covenant." § 5.73 [3], pp. 5–186 to 5–190. Cited in support of the minority rule are the California cases of Friesen v. Glendale, 1930, 209 Cal. 524, 288 P. 1080 and Lombardy v. Peter Kiewit Sons' Co., 1968, 266 Cal.App.2d 599, 72 Cal. Rptr. 240.[4]

Friesen v. Glendale, supra, contains a rather exhaustive discussion of the nature of an interest created by a building restriction and concludes that it "is not a positive easement or right in the land itself which would permit of the physical use or occupation thereof by the other lot owners in the tract. It is

merely a right enforceable in equity as between the parties to the contract, or their successors with notice, on the theory that it would be unconscionable to permit one who had contracted to use his property in a particular way to violate his agreement." 288 P. at 1082. The court held that the covenant did not "rise to the dignity of an estate in the land itself" and that it is "a contractual right cognizable in equity as between the contracting parties, not binding on the sovereign contemplating a public use of the particular property taken." Id. at 1083.[5]

In Lombardy v. Peter Kiewit & Sons' Co., supra, the most recent of the California cases, after quoting at length from the Friesen decision, the court concluded that it is "the law in California that building in use restrictions of a residential tract do not constitute an interest in land vested in the lot owners which is damaged by the construction of a state freeway through the tract." 72 Cal.Rptr. at 244.

There are no California cases involving an "equitable servitude" in the nature of a right of assessment and lien for operation and maintenance charges for water furnished by a reclamation project. It does appear, however, that

with respect to whether the "extinguishment of an equitable servitude under the power of eminent domain is a taking" which requires that compensation be paid "when the land to which it is attached is taken for public use." The court concluded that the majority and better view favored compensation.

3. Nichols also cites under note 7 the California cases of Martin v. Holm, 1925, 197 Cal. 733, 242 P. 718 and Beverly Hills v. Anger, 1932, 127 Cal.App. 223, 15 P.2d 867.

4. 3 Witkin, Summary of California Law, 7 Ed. 1960, Constitutional Law, Section 231, at 2041–2042 reads in part:
    "There is substantial authority supporting compensation for those whose equitable servitudes in other property have been destroyed by the taking of that property. But California follows the view that the interest is too remote and the possible scope of compensation

too great, and denies an award. (See Friesen v. Glendale (1930) 209 C. 524, 288 P. 1080; 19 Cal.L.Rev. 58; 42 Cal.L.Rev. 629; 3 U.C.L.A.L.Rev. 258; 1953 A.S. 606; 1957 A.S. 441.)
    "The rule of the *Friesen* case was applied to another indirect interest in Hayward v. Mohr (1958) 160 C.A.2d 427, 325 P.2d 209. Defendant granted an easement for a sewer line, reserving a right to make sewer connections for her own land. *Held*, this reserved right was not an easement but a mere contract right in another easement, which was not property within the constitutional provision."
For further discussion of the conflicting authority in California see Annot. "Eminent Domain—Restrictive Covenants", 4 A.L.R.3rd 1137, and compare § 3 at 1142 with § 7 at 1155.

5. See also Sackett v. Los Angeles City School District, Dist.Ct. of App., 4th Dist. 1931, 118 Cal.App. 254, 5 P.2d 23.

the California courts have recognized the right to water for the irrigation of land as a servitude upon the ditch or canal delivering the water rather than a "mere contract right" enforceable in equity as between the parties to the contract.[6]

In Stanislaus Water Co. v. Bachman, 1908, 152 Cal. 716, 93 P. 858, the plaintiff water company sued the defendant water user to recover an amount alleged to be due for water sold and delivered. The water was delivered pursuant to a contract between the predecessor of the water company and the predecessor of defendant. The plaintiff and defendant both obtained title pursuant to separate foreclosure sales. In discussing the nature of the purchaser's interest in the water, the court said in part:

" * * * The right in water which has been diverted into ditches or other artificial conduits, for the purpose of conducting it to the land for irrigation, has been uniformly classed as real property in this state. * * * So, in the case at bar, the right of Threlfall and his successor, Bachman, under the agreement, to have the water flow from the plaintiff's canal through the lateral ditch, to the land, for its irrigation, is a servitude upon the ditch and upon the canal, is an appurtenance to the land, and is real property." 93 P. at 863.

Stanislaus Water Company v. Bachman was followed in Henrici v. South Feather Land & Water Co., 1918, 177 Cal. 442, 170 P. 1135, and has been cited, explained, and to some extent distinguished, in Leavitt v. Lassen Irr. Co., 1909, 157 Cal. 82, 106 P. 404 and Coulter v. Sausalito Bay Water Co., Dist. Ct.App., 1 Dist. 1932, 122 Cal.App. 480, 10 P.2d 780, 785.

If federal law is applied Adaman is controlling.[7] Assuming that the question should be determined by California law, as plaintiff contends, there are no decisions of the California court covering the situation presented in this case. It does appear, however, that the California courts have recognized the right to water as more than a "negative easement" or contractual right of a building restriction. I agree with counsel for the United States that there is nothing in the California law inconsistent with the holding in Adaman that the "benefit derived from [the] servitude, in the form of lower irrigation costs, adheres to every acre of land within the Project to which the stock is appurtenant. The benefit is encompassed by the water rights appurtenant to each parcel and runs with the land to the same extent as does the burden to pay assessments." 278 F.2d at 847.

It is true, as plaintiff contends, that in Adaman the condemnee was a private nonprofit water company, with no right to tax. The court recognized that the situation was "decisively unlike those cases in which the loss of the power to assess amounted to no more than a diminution of the statutory taxing power possessed by the instrumentality claiming the loss." The court continued:

" * * * When the right to assess cannot be distinguished from the

6. San Joaquin & Kings River Canal & Irrigation Co. v. Stanislaus County, 1914, 233 U.S. 454, 460–461, 34 S.Ct. 652, 58 L.Ed. 1041, 1046.

7. The parties apparently assume that California law is applicable. By reason of the fact that the land taken is allotted land on an Indian reservation, this is doubtful. "Lands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State * * * where located in the same manner as land owned in fee may be condemned." 25 U.S.C. § 357. The procedures and scope of highway use are governed by state law. To the extent, however, that the property interests involve construction of an Act of Congress, it is questionable whether the federal courts are bound by state court decisions in determining whether the right to assess the land condemned is compensable under the Fifth Amendment. See 1A Moore, Federal Practice, 2 Ed. 1965, § 0.323 [11] at 3743–3744 and cases there cited; 1 Nichols on Eminent Domain, 3 Ed. 1970, § 2.224 at 268. It is unnecessary to decide this question in view of the conclusion that under California as well as federal law there is a right to compensation.

taxing power, the interest lost is clearly non-compensable. To allow compensation would be to subject the United States to the taxing power of several states, a result offensive to the Constitution since McCulloch v. State of Maryland, 1819, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579. [citing cases].[8] In the instant case the right to assess does not lie with any governmental authority endowed by legislation with the power to tax. Accordingly, the award of compensation here would in no way impinge upon the basic principles of federalism at play in the cases cited above." 278 F.2d at 849.

In a footnote the court comments on the distinction recognized by some courts between taxes and assessments, saying in part:

"On the other hand, we do not derive support from Columbia Irrigation District v. United States, 9 Cir., 1959, 268 F.2d 128; United States v. Florea, D.C.D.Or.1945, 68 F.Supp. 367, or United States v. Aho, D.C.D.Or. 1944, 68 F.Supp. 358. Those cases involved situations similar to the one before us except that the right to assess was legislatively granted. The claimant was a creature of statute; its assessments were akin to taxes. The cases cited above attempt to distinguish special assessments from taxes and to differentiate the power to tax in general from the special circumstances which surround public projects involving agricultural use of land. We need not rely upon that distinction." Id. at 849 n. 10.

Obviously the court in Adaman was not concerned with assessments which might be "akin to taxes." I do not construe the footnote, however, as repudiating the cases there cited, and particularly the Ninth Circuit case of Columbia Irrigation District v. United States.

In United States v. Aho, supra, and United States v. Florea, supra, the court held that the obligation to pay future assessments in a drainage district was an encumbrance on realty and distinguishable from ordinary taxes. In Aho the court said in part:

"There is, of course, a well recognized distinction between taxation and the levy of assessment for a special benefit. This distinction becomes very broad when a group of lands in a peculiar situation is amalgamated by the power of a state for the purpose of apportioning the indebtedness arising from the construction of vital protective works and the cost of perpetual maintenance. The use of the sovereign power to compel this banding together of the landowners in a certain area is required because otherwise a recalcitrant landowner situated upon key property would be able to block irrigation and drainage of areas of land utterly waste in the natural state, but of great fertility when so improved. The fiscal experience of such entities shows that the plans for payment of the indebtedness and upkeep is so closely figured that when a very small proportion of the included lands no longer pays the assessment, the project becomes unfeasible. The pressure for the passage of the municipal bankruptcy act was caused largely by the failure of such districts once a small proportion of the lands could no longer be profitably cultivated in the depression era." 68 F. Supp. at 361.

Judge Fee also pointed out the "differentiation * * * between a local improvement district for the purpose of improving streets in an existing munici-

---

8. In all of the cases cited the United States was condemnor. It was recognized that the federal government is immune from any form of state taxation. The assessments were levied by creatures of the state pursuant to state law and were held to be taxes or in the nature of taxes. Most of the cases also held that no lien existed in favor of the irrigation or drainage district and no property interest was taken. See, e. g., Yoknapatawpha Drainage Dist. No. 2 v. United States, 5 Cir. 1957, 242 F.2d 925.

pality, and the situation here. The easements for the streets are there already in existence and the expense of improvement thereof is the only matter sought to be imposed. In the Drainage Districts, definite common law easements are created. These become appurtenances of the particular parcels of land." Id. at 363.

In United States v. Howell, D.Ore. 1965, 251 F.Supp. 787, the court held that the condemnee irrigation district owned no interest in the ditches or canals located on the property taken and had no right to compensation. In distinguishing Aho and Florea the court pointed out that both of those cases involved drainage districts and that Judge Fee had recognized this distinction in Florea in calling attention to the fact that the land taken continued to be benefited by the drainage of the land, whereas this is not true with respect to irrigation. Aho and Florea were similarly distinguished in Helena Valley Irr. Dist. v. State Highway Com'n, supra.[9]

Columbia Irrigation District v. United States, supra, was a condemnation action including various parcels of land, and the court was concerned primarily with the question of whether the irrigation district as condemnee had a property right in the respective parcels. Judge Fee, who wrote the opinions in Aho and Florea as a district judge, was also the author of the opinion in Columbia River Irrigation District. Aho and Florea are not discussed in Columbia, which has been cited in various contexts in subsequent cases. In outlining the basis for a consideration of the question of compensability on a new trial, the court said in part:

> " * * * (2) There is no right in the State or one of its agencies, such as a quasi-municipal corporation, to tax property in the ownership of the United States. A tax by way of assessment for local benefits cannot be levied by the State or a quasi-municipal corporation against the United States or land owned or condemned by it. (3) If the District had no property in Parcel II, there can be no severance damage and, of course, no compensation where there was no taking. The mere fact that it was an economic advantage for the District to sell a service to the people included within its boundaries is not compensable. The removal of these lands from the boundaries of the District may have rendered its business unprofitable, but, if that were all that is involved, the government is not liable therefor.

> "Here Columbia, not as a state agency, but Columbia as an owner of property, commands our attention. If Columbia proves no property in Parcel II, this action is at an end.

> " * * * *

> "Here, if Columbia proved, as the intimations in the record seem to demonstrate, that it possesses property consisting of canals, ditches and other facilities on the lands of Parcel II, payment must be made therefor. If it also be shown that these physical properties are concomitant with incorporeal hereditaments recognized by the common law as easements appurtenant to land of Parcel I, owned by Columbia, these must be paid for also. Such easements might consist of rights of way or canals, laterals and ditches, the right to flow water through such facilities, and the right to deliver water at a particular parcel of land and receive payment therefor."

The court's conclusion is particularly pertinent in this case, in the light of Adaman:

> "If the right to a canal and an easement for a right of way therefor, together with the right to deliver water to a parcel of land, existed in a pri-

---

9. Many other courts have also declined to follow the holding in Aho and Florea that a property right is involved or the distinction recognized in those cases between taxes and assessments. See, e. g., Yok-napatawpha Drainage Dist. No. 2 v. United States, supra; United States v. 1,000 Acres of Land, etc., E.D.La.1958, 162 F. Supp. 219.

vate corporation and the government condemned that property right, just compensation would necessarily be paid therefor. The mere fact that this property right is lodged in a public body should make no difference. It is nonsensical to confuse this property right, if it exist, with the power of taxation or the governmental power to levy assessments to pay for local improvement." 268 F.2d at 131–132.

Turning briefly to the California cases, it is well settled that lands owned by a governmental agency within the confines of an irrigation district are liable to assessment if not used for a public purpose, but exempt from assessment if devoted to a public use. Reclamation Dist. No. 684 v. East Bay Municipal Utility District, Ct. of App. 3rd Dist. 1928 (Hearing denied by Supreme Court), 91 Cal.App. 143, 266 P. 969.[10] The United States could not include state owned lands used for a highway or other public purpose in an irrigation project and subject them to assessment. This does not, however, answer the question presented —whether the United States is entitled to compensation by reason of its lien and property interest for the taking of irrigable lands on an Indian reservation which are already subject to assessment.[11]

The defendant United States is not seeking an order to compel the State of California to pay future assessments but rather seeks the market value of the diminution of the assessment base by reason of the taking of lands already under

irrigation and subject to a federal lien. It is clear from Adaman that a private water company would be entitled to compensation. As Judge Fee suggested in Columbia Irrigation District, there is no reason that recovery should be denied simply because the same right is lodged in a public body, unless of course the power to assess cannot be separated from the power to tax. The United States, however, unlike the state, does not impose taxes on the property. Its sole right, like the private company, is to assess the land for operation and maintenance charges. On the basis of Adaman and Columbia Irrigation District I conclude that the Government is entitled to compensation for the diminution of the assessment base.[12]

With respect to the second question presented, it is clear that compensation for diminution of the assessment base was not "included in the fair market value of the land." The right to this compensation does not accrue for the benefit of the landowners whose land was taken, but rather for the benefit of those landowners whose land remains subject to the higher assessments necessary to pay the operation and maintenance costs of the project. See 2 Nichols on Eminent Domain, 3 Ed. 1970, § 573 at 5–178. The United States, as condemnee, is both the owner of the reclamation project and trustee for the landowners.

In People ex rel. Dept of Public Works v. Lynbar, Inc., Ct. of App., 2nd Dist. 1967, 253 Cal.App.2d 870, 62 Cal.Rptr. 320, 327–328, the court affirmed the de-

---

10. In a number of cases, beginning with San Diego v. Linda Vista Irrigation Dist., 1895, 108 Cal. 189, 41 P. 291, the California courts have recognized the distinction between "taxes" and "assessments", holding that the California constitutional provision (Art. 13, § 1) exempting property owned by governmental agencies from taxation does not include assessments by an irrigation district. It has been held further, however, that while there is no express constitutional exemption, there is an implied exemption, "dependent upon the use to which the property is put." City of Fresno v. Fresno Irr. Dist., 1925, 72 Cal.App. 503, 237 P. 772, 774.

11. See comment in United States v. Aho, supra, 68 F.Supp. at 363 with reference to San Diego v. Linda Vista Irrigation District, supra, 108 Cal. 189, 41 P. 291.

12. As noted, there are no clear cut decisions which answer the precise question presented. Plausible arguments have been advanced in support of the respective contentions of the parties. The conflicting decisions may not wholly be reconciled. Adaman and Columbia Irrigation District are of course controlling, and my conclusion is based primarily on my interpretation of the holdings in those cases and what appears to me to be the proper result.

cision of the lower court awarding compensation for a leasehold interest apart from the ownership of the land. The court recognized that "just compensation is based on the loss the owner suffers rather than the benefit which the taker receives", rejected the undivided fee rule, and held that all of the owners or holders of an interest in land are entitled to receive the value of their respective estates or interests as a part of the valuation of the property as a whole.

The parties have agreed that upon a finding of compensability, they will either stipulate upon the amount of compensation due the United States or litigate this issue. After the parties have determined this question, the defendant United States will prepare, serve and lodge form of judgment consistent with this order and memorandum opinion.